

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-30-2005

# Harvey v. Plains Twp Pol Dept

Precedential or Non-Precedential: Precedential

Docket No. 04-1148

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Harvey v. Plains Twp Pol Dept" (2005). *2005 Decisions.* Paper 580.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/580

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-1148

———

ELIZABETH HARVEY

<u>Appellant</u>

v.

PLAINS TOWNSHIP POLICE DEPARTMENT; EDWARD J.
WALSH; RONALD DOMBROSKI; PLAINS TOWNSHIP
BOARD; JOAN A. CHUKINAS

———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 01-cv-01768)
District Judge: Honorable A. Richard Caputo

———

Argued April 18, 2005
Before: ROTH, FUENTES, and BECKER, <u>Circuit Judges</u>.

(Filed: August 30, 2005)

JAMES A. SWETZ (ARGUED)
Cramer, Swetz & McManus, P.C.
711 Sarah St.
Stroudsburg, PA 18360
  *Attorney for Appellant*

C. KENT PRICE (ARGUED)
Shawn E. Smith
Thomas, Thomas & Hafer, LLP
305 N. Front St.
P.O. Box 999

Harrisburg, PA 17108-0999
*Attorneys for Appellees Plains Township Police*
*Department, Edward J. Walsh, Ronald Dombroski, and*
*Plains Township Board*

ROBERT T. PANOWICZ (ARGUED)
11 West Market St., Suite 1122
Wilkes-Barre, PA 18701
*Attorney for Appellee Joan A. Chukinas*

————

OPINION OF THE COURT

————

FUENTES, Circuit Judge.

This appeal raises questions regarding the liability of a police officer and a landlord involved in an ex parte private repossession by a former boyfriend of the plaintiff. We hold that a police officer actively involved in such a repossession may be engaged in state action in violation the Fourth Amendment. We will reverse the grant of summary judgment in favor of the officer because the District Court improperly resolved a material factual dispute in favor of the police officer on this issue. We also hold that the landlord, who, according to the plaintiff, participated in the repossession by opening the door to the plaintiff's apartment at the direction of the police officer, was not engaged in state action. We will therefore affirm summary judgment in the landlord's favor. We will also affirm summary judgment in favor of the Police Department, the Police Chief, and the Township Board because the plaintiff did not show any evidence of deliberate indifference.

## I. Facts & Procedural Posture

This case centers around a private repossession of property

2

by an ex-boyfriend from his former residence.[1] In 1998, Plaintiff/Appellant Elizabeth Harvey and her then-boyfriend Edward Olowiany jointly leased an apartment in the township of Plains, Pennsylvania. After the relationship deteriorated, Harvey obtained a Protection from Abuse Order ("PFA") against Olowiany, which granted Harvey the exclusive right of possession of the apartment, and ordered Olowiany to retrieve all of his belongings immediately after entry of the PFA. At the PFA hearing, Olowiany requested that he be allowed to return to the apartment, in order to pick up furnishings and other things that would be difficult to remove during his first trip. His request was denied, although he claims that the judge noted that he could return if he made arrangements with Harvey.

Olowiany's attorney sent a letter to Harvey asking her to set a time for Olowiany to retrieve his remaining property. The letter also contained an itemized list of that property. Harvey did not to respond to the letter. The attorney sent a second letter, stating that on September 18, 1999 at 2:00 p.m., Olowiany would arrive to retrieve his belongings accompanied by a Plains Township police officer. He sent a copy of this letter to the Plains Township Police Department ("Police Department") and to Harvey's landlord, Joan Chukinas. Because she was residing elsewhere at the time, Harvey claims she never received the second letter.

On September 18, Officer Ronald Dombroski was sent to the Harvey residence by a supervisor in order to keep the peace at the repossession. Dombroski was given a copy of the list of items to be retrieved, as described in Olowiany's attorney's first letter. At the agreed-upon time, Olowiany, Dombroski, and Chukinas arrived at the apartment. Harvey, apparently unaware that her apartment was to be entered, was not present. Dombroski directed Chukinas to unlock the door, so that Olowiany could retrieve his

_____

[1]Because this is an appeal from the grant of summary judgment to all defendants, our stated facts reflect those presented by the plaintiff below.

3

property.[2]   After entry, Olowiany removed items from the apartment. While Dombroski claims that he attempted to verify that only listed items were taken, upon returning to the apartment, Harvey found that it was in disarray and that many items were missing, including several that were not included in the list accompanying the first letter.

Harvey brought suit under 42 U.S.C. § 1983 against Dombroski, Chukinas, Police Chief Edward Walsh, the Plains Township Police Department, and the Plains Township Board.[3] The essence of her complaint is that the actions of Dombroski and Chukinas were in violation of the Fourth Amendment, and that Walsh, the Police Department, and the Township failed to adequately train Dombroski. The defendants moved for summary judgment, and the District Court found for all of them. It held that Dombroski was protected by qualified immunity, because, although he violated Harvey's clearly established Fourth Amendment rights, he acted reasonably. Chukinas prevailed because, in the District Court's view, she was not acting under color of law or in concert with Dombroski. The failure to train claim against the remaining defendants failed because Harvey did not set forth any evidence of deliberate indifference or identify an appropriate alternative training program. Harvey appeals from the District Court's grant of summary judgment to the defendants.[4]

## II.  Officer Dombroski

---

[2]The District Court in its recitation of the facts and subsequent analysis found that Dombroski merely assented to Chukinas's opening of the door, after she asked him whether she could open it. This is a highly contested issue, as discussed later.

[3]Perhaps curiously, Olowiany was apparently not included as a defendant.

[4]The District Court had federal question jurisdiction over the civil rights action under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction over the District Court's final order disposing of all claim under 28 U.S.C. § 1291.

4

To prevail on this appeal with respect to Officer Dombroski, Harvey must show: (1) that Dombroski took part in state action; (2) that the state action violated her asserted constitutional rights; and (3) that Dombroski is not entitled to qualified immunity with respect to the constitutional violation. We address these issues in that order.

## A. State Action

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). To satisfy the state action requirement, the defendant must have used authority derived from the state in causing the alleged harm. See Abbott v. Latshaw, 164 F.3d 141, 146 (3d Cir. 1998).

In Abbott, we considered the state action question under facts somewhat similar to those in this case. 164 F.3d 141. Mark Abbott and Laurie Latshaw were a divorced couple. During their marriage, Latshaw's father purchased a van for the couple and eventually sold any interest that he may have had in it to Abbott in exchange for Abbott's promise to pay off the loan, which Abbott fulfilled. However, Abbott never received the title from Latshaw's father, and after the divorce, the father transferred the title to his daughter, rather than Abbott. She then sought repossession of the van by enlisting Albert Diehl, a county constable, notifying him of these facts and paying him to help her retrieve the vehicle. To prove that she owned the van, Latshaw showed the constable the title and a temporary registration. Diehl asked Abbott for the keys to the van, but Abbott refused, arguing that he paid for the van and he owned it. Diehl then summoned the police, and, in response, three officers arrived: Officer Sarsfield, Officer Stafford, and Lieutenant George. At about the same time, Abbott's attorney arrived at the scene and boxed in the van, just as a locksmith had completed a duplicate key for Latshaw. Lieutenant George ordered the attorney to unblock the van, and arrested the attorney after he refused to do so. In the meantime, Latshaw got into the van and managed to get around the attorney's car and drive away. Abbott

filed a § 1983 action against his ex-wife Latshaw, Constable Diehl, Officers Sarsfield and Stafford, and Lieutenant George, alleging that they deprived him of his property–the van–without due process in violation of the Fourteenth Amendment. The District Court dismissed all of the claims based on qualified immunity or lack of state action. On appeal, we considered whether state action could be found with respect to the various actors.

We found that Diehl's actions could be considered state action:

> The constable played a principal role in the seizure. Latshaw enlisted him, and paid for his help because she believed that she could not take the van from Abbott without it. According to Abbott, "Mr. Diehl walked into my office and identified himself as a constable and told me that he was [there to] take my vehicle," and that "we're going [to] take the vehicle one way or another." The constable threatened to arrest Abbott for driving "her vehicle" if he tried to drive the van home. Viewing the record in the light most favorable to Abbott, we find that a reasonable jury could conclude that Diehl used his public authority to help Latshaw take possession of the van, and as such was obligated to notify Abbott of the seizure in advance and to provide him with a meaningful opportunity to be heard.

Id. at 147. As to the police officers, we found that the mere presence of Sarsfield and Stafford at the repossession did not constitute state action:

> The Greensburg police officers were called to the scene to check Latshaw's documentation, which they did. There is no evidence that two of the officers–Sarsfield and Stafford–did any more than this. The mere presence of police at the scene of a private repossession does not, alone, constitute state action causing a deprivation of a protected property interest. . . . Officers Sarsfield and Stafford confined

6

their conduct to the routine police procedures of checking the vehicle registration, and cannot be said to have used state action to deprive Abbott of his due process rights.

Id. at 147. We, however, did find George's actions to qualify as state action (at least for summary judgment purposes):

> Lieutenant George did not remain neutral, but advised Latshaw that she had a right to immediate possession of the van. Lt. George also ignored [Abbott's attorney's] ardent protest of the seizure, and threatened to arrest [the attorney] if he did not move his car to make way for Latshaw. Although he was not the instigator, a jury could find that Lt. George, by his conduct, joined forces with Diehl in the unconstitutional deprivation, going beyond the permissible conduct outlined in Menchaca.

Id. As to Latshaw, we first noted that, "[a]lthough not an agent of the state, a private party who willfully participates in a joint conspiracy with state officials to deprive a person of a constitutional right acts 'under color of state law' for purposes of § 1983." Id. at 147-48. We reinstated the claim against Latshaw, finding that state action was sufficiently alleged, as "Abbott had alleged in his complaint that Diehl acted 'at the instance and request of Defendant Latshaw' and . . . the complaint depicted joint action by Latshaw and Diehl in effectuating the recovery of the van," and that the allegations had at least some support in the facts. Id. at 148.

Here, Dombroski argues that his action does not constitute state action, because he merely was present at a private repossession–likening his conduct to Officers Sarsfield and Stafford in Abbott. We reject this argument. In an answer to an interrogatory, Chukinas, the landlord, states that she opened the door "at the direction and with the permission of the Plains

Township Police."[5] App. 501; see also App. 368-69 (confirming that Dombroski "ordered [her] to open the apartment"). Thus, for purposes of summary judgment, we must accept for a fact that Dombroski directed Chukinas to open the door. Moreover, Chukinas stated, in her deposition, that "I would never have opened the door if I didn't have permission from the policeman." App. 365-66. Like in Abbott, viewing the facts in this manner, it appears that Dombroski "played a principal role in the seizure" and a reasonable jury could conclude that Dombroski used his public authority to help the ex-boyfriend gain entry to and seize property from Harvey's apartment. The record supports a finding that he was not a mere spectator, but in fact a but-for cause of the seizure.

Dombroski relies on cases that allegedly suggest that the plaintiff's presence, here Harvey's presence, was necessary for state action to have taken place. See, e.g., Barrett v. Harwood, 189 F.3d 297, 302-03 (2d Cir. 1999); Breiner v. Litwhiler, 245 F. Supp. 2d 614, 626 (M.D. Pa. 2003). While the presence of the plaintiff at the alleged constitutional violation was important in these cases, it was important not in itself but as an indicator of the role that the defendant likely played. In Barrett, the Second Circuit found that an officer's warning to the plaintiff against "start[ing] any trouble" was a reasonable peacekeeping response to the plaintiff's violent opposition to the repossession. 189 F.3d at 303. The court stated that the "crucial question" was whether or not the officer was "taking an active role that either affirmatively assisted in the repossession over the debtor's objection or intentionally intimidated the debtor so as to prevent him from exercising his legal right to object to the repossession." Id. at 302-03. However, we believe that the implication that the plaintiff must be present was in response to the factual situation presented. This is made clear by the court's earlier more general formulation of the issue:

_____

[5]Interrogatories are part of the summary judgment record: Summary judgment is only proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis added).

8

"When an officer begins to take a more active hand in the repossession, and as such involvement becomes increasingly critical, a point may be reached at which police assistance at the scene of a private repossession may cause the repossession to take on the character of state action." Id. at 302. Thus, we do not read Barrett as embracing a rule that requires the plaintiff's presence in order to find state action.

In Breiner, the district court assigned significance to the plaintiff's absence at the scene because it showed that she was not intimidated by the police presence–intimidation being one method by which an officer might help effectuate a constitutional violation. Id. at 626. However, as in Barrett, what was ultimately important was whether the injury to the plaintiff was aided by the use of state-derived authority, not whether the alleged state action was immediately directed at the plaintiff. Here, the record supports a finding that the officer used his authority to compel Chukinas to open the door. Thus, the use of state-derived authority–Dombroski's order to open the door–was critical to the repossession, satisfying the state-action test discussed above.[6]

B.      Constitutional Violation

The District Court found that "[t]he law was unquestionably

---

[6]It is a much different question whether state action could be found if Chukinas asked Dombroski if she could open the door and he assented (such that there was no official order to open the door). The cases above suggest that Dombroski's mere assent to opening the door, provided that the choice to open the door remained with Chukinas, would not qualify as state action. See Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 52 (1999) ("Action taken by private entities with the mere approval or acquiescence of the State is not state action." (emphasis added)). Although this is the situation that Dombroski and Chukinas now present, Chukinas's earlier statements create a factual dispute that must be resolved in Harvey's favor, rendering this issue irrelevant at this point in the case, with respect to the characterization of Dombroski's action as state action.

9

clear in September, 1999, that the Fourth Amendment prohibited unreasonable searches and seizures of a person's home by the police without a warrant." App. 8 (citing Payton v. New York, 445 U.S. 573, 583-85 (1980)). In arguing that the District Court should be affirmed, the defendants (including Dombroski) do not appear to deny this contention.[7] Instead, Dombroski focuses on state action, as discussed above, and on the argument that he was at a private repossession merely to keep the peace and did not go beyond performing that function. Accordingly, we will not disturb the District Court's finding that Dombroski's actions violated the Fourth Amendment.

In addition to the Fourth Amendment violation, Harvey notes in her reply brief that she "also claims that her right to due process was violated." Reply Br. of Appellant at 4. It is unclear whether a due process claim was properly raised in her complaint or explicitly made before the District Court, as the finding by the District Court that Dombroski violated the Fourth Amendment allowed it to move to the reasonableness prong of qualified immunity without having to consider other constitutional claims. Of course, that claim could have provided a ground to deny qualified immunity, but we need not dwell on this issue. As Harvey neglected to raise this argument in her opening brief, we find it waived.[8] United States v. Pelullo, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal.") (citing In re Surrick, 338 F.3d 224, 237 (3d Cir. 2003)).

_____

[7]They do not argue that there was no search or seizure or that his actions were in the nature of "community caretaking." See United States v. McGough, No. 04-12077, 2004 WL 3389374, at *4 (11th Cir. June 15, 2005). We have not had the occasion to consider such an exception and need not do so at this time.

[8]We note in passing that our discussion of due process claims for random and unauthorized official conduct in Brown v. Muhlenberg Township casts doubt on the viability of a due process claim here. 269 F.3d 205, 213-14 (3d Cir. 2001) (citing Hudson v. Palmer, 468 U.S. 517, 533 (1984)).

10

C.      Qualified Immunity

"Qualified immunity shields public officials performing discretionary functions from § 1983 and Fourteenth Amendment liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Abbott, 164 F.3d at 148 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Our qualified immunity inquiry is a two step process.  First, we must determine whether the defendants violated "clearly established" rights.  Id. This entails a finding of a constitutional or statutory violation as well as a finding that the violated right was clearly established at the time of the violation.  Second, we determine whether a reasonable officer would have believed that his or her conduct deprived the plaintiff of his or her constitutional rights.  Id.

The Fourth Amendment right violated here was clearly established at the time that the events that gave rise to this case took place.  As the District Court noted, Payton made clear in 1980 that warrantless searches are not permissible absent an exception; no such exception is implicated here.

The main issue here is whether Dombroski's belief that he was acting lawfully was reasonable.  The District Court found that Dombroski's conduct was reasonable, because he was ordered by his superior to keep the peace during the repossession, was given the letters sent by Olowiany's attorney, and believed that Harvey and Chukinas had received the letter detailing the time of the repossession and the items to be removed (this latter belief was deemed reasonable because the letter indicated that it was sent to those parties).  Thus, the District Court reasoned, "as far as Dombroski knew, the necessary arrangements had been made for Olowiany to retrieve his belongings, and his role was simply to keep the peace."  App. 10.  Accordingly, "Dombroski reasonably believed that by allowing Chukinas to unlock the door, and his entering the apartment, he was acting to keep the peace."  The District Court found that "Dombroski was acting under a belief that the owner of the property was retrieving possessions with permission from the possessor."  Id.

11

The essence of the District Court's analysis appears to be that it was reasonable for Dombroski to conclude that Harvey consented to the repossession. This belief was based on the fact that the letter detailing the time of the repossession was sent to Harvey. We believe that it is unreasonable to conclude, on the basis of a letter that the ex-boyfriend's attorney sent Harvey, to which she did not respond, that Harvey consented to the repossession.[9] Officer Dombroski had no reason to believe that Harvey had received the letter or, more importantly, that she had consented to the repossession. Especially with knowledge of the existence of a domestic violence order, a reasonable officer should have determined whether consent was given by Harvey for the repossession. A reasonable officer at least would have refused to assist with opening the door until he was satisfied that consent was given. See Payton, 445 U.S. at 585 (reiterating that "'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed'") (quoting United States v. U.S. District Court, 407 U.S. 297, 313 (1972)). That he was ordered to keep the peace should be irrelevant, as Officer Dombroski's actions went well beyond merely keeping the peace. Dombroski's supervisor simply ordered him to keep the peace, not to have the door opened in order for the ex-boyfriend to remove property. App. 446 ("I was to go down there and to keep the peace down there, because there was a PFA in effect, and [Olowiany] was going to be removing some of his items from the residence.").[10]

---

[9]The letter read, in relevant part:
Be advised that my client, Edward Olowiany, accompanied by the Plains Township Police Department, will present themselves at your residence to recover items from the apartment Mr. Olowiany previously shared with you on Saturday, September 18, 1999, at 2:00 P.M.
App. 94. The letter also stated that a copy was sent to Chukinas.

[10]Although Dombroski has stated that he was also instructed "to make sure that [Olowiany] adheres to the list," App. 458, this instruction did not require him to order the door to be opened, but rather simply involved passive observation of the repossession.

12

Our dissenting colleague argues that our conclusion runs afoul of Anderson v. Creighton, 483 U.S. 635 (1987), because Dombroski "could have believed that his conduct was lawful in light of the information in his possession." We certainly agree, as we must, that Creighton requires a particularized inquiry, involving consideration of both the law as clearly established at the time of the conduct in question and the information within the officer's possession at that time. However, we part ways when considering whether the information in Dombroski's possession could reasonably have supported the belief that his actions were constitutional. As an initial note, there is no need to "particularize" the Fourth Amendment right implicated here beyond "the basic rule, well established by [Supreme Court] cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional." Groh v. Ramirez, 540 U.S. 551, 564 (2004) (citing Payton, 445 U.S. at 586-88) (discussing qualified immunity and noting that "[n]o reasonable officer could claim to be unaware" of this rule). As in Groh, there was no exigency here, and the Groh Court rejected, over a dissent, the notion that "ample room" must be made for mistaken judgments of law or fact in cases in which no exigency exists. Id. at 565 n.9. Thus, the simple question we are faced with is whether it was reasonable for Dombroski to infer consent from the knowledge in his possession. Our dissenting colleague notes that "there is a presumption that a properly mailed item is received by the addressee." However, we do not see how Dombroski could reasonably infer from the presumption of mailing that Harvey consented to anybody entering her apartment.[11] Our colleague

---

[11]Our colleague also points to language in the PFA stating that Olowiany was "to pick up personal belongings," but notes the possible tension between that provision and another provision "grant[ing] exclusive possession of the residence." App. 91. As an initial note, while the record suggests that the Sergeant who dispatched Dombroski had a copy of the PFA when explaining the situation to Dombroski, it is unclear whether Officer Dombroski actually read the PFA. App. 447. Accordingly, Dombroski's familiarity with the PFA appears to be an unresolved historical issue within the province of the jury, and we should make the

13

seems to question what Dombroski should have done "at what he understood to be a long prearranged appointment." He should have done exactly what he was dispatched to do–keep the peace–and not affirmatively aid in the removal of property from Harvey's apartment. We stress that, at this stage, we must take for a fact that the officer <u>ordered</u> the landlord to open the door. This, and only this, is the action we find to be unreasonable, and clearly so.

Because we find Officer Dombroski's conduct to be unreasonable given the facts presented, we will reverse the District Court's grant of summary judgment on qualified immunity grounds to Dombroski.[12]

## III. Joan Chukinas

The District Court, as regards to the culpability of the

---

favorable inference for Harvey that Dombroski was not familiar with the PFA. In addition, one could understand the PFA as mandating that Harvey make reasonable efforts to accommodate Olowiany's efforts to retain his belongings. However, there is no evidence that she was being unreasonable, and the PFA does not appear to grant a general right of entry to Olowiany.

[12]The parties appear to be in disagreement over the proper role of the jury in qualified immunity determinations. Although the courts of appeals are not unanimous on this issue, this Court has held that "qualified immunity is an objective question to be decided by the court as a matter of law." <u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 242 (3d Cir. 2004) (citing <u>Doe v. Groody</u>, 361 F.3d 232, 238 (3d Cir. 2004)). "The jury, however, determines disputed historical facts material to the qualified immunity question." <u>Id.</u>; <u>see also</u> <u>Curley v. Klem</u>, 298 F.3d 271, 278 (3d Cir. 2002). "A judge may use special jury interrogatories, for instance, to permit the jury to resolve the disputed facts upon which the court can then determine, as a matter of law, the ultimate question of qualified immunity." <u>Curley</u>, 298 F.3d at 279. At this stage, however, the summary judgment standard requires the Court to resolve all factual disputes in Harvey's favor and grant her all reasonable inferences, obviating any need to look to a jury.

14

landlord, found that, as a matter of law, "Chukinas's conduct [did] not rise to the level of a constitutional violation" because she "neither acted under color of law, nor did she act in concert with Dombroski." App. 12. It found that she did not assert any state authority in opening the door and that there are no facts alleged that support a finding that Chukinas and Dombroski acted in concert. Our discussion of the law regarding state action and of the alleged constitutional violations provides the relevant background.

Harvey argues that, because the door was unlocked through some sort of interaction between Dombroski and Chukinas, they, by definition, acted jointly, satisfying the test from United States v. Price, 383 U.S. 787, 794 (1966) ("Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of [§ 1983]."), for private party state action. However, the Price test requires more than joint action, but rather requires that the private actor at least be "a willful participant in joint activity with the State or its agents." 383 U.S. at 794 (emphasis added). Thus, compelled participation by a private actor may fall outside of the contours of state action.

As we are considering Chukinas's motion for summary judgment here, we construe the facts in the most favorable light to Harvey. The record supports three possible scenarios with respect to Chukinas: (1) she acted on her own in opening the door for Olowiany; (2) she acted with Dombroski's permission in opening the door, but the choice of whether or not to open it was hers; or (3) she acted at Dombroski's direction in opening the door. If, under any of these scenarios, Chukinas could be considered to have engaged in state action, we must reject the District Court's finding that Chukinas did not engage in such action.

Under the first scenario, in which Chukinas acted without any input from Dombroski, Dombroski would merely have been present at the scene and would not have used any of the state's coercive powers. Accordingly, there would be no state action by Dombroski, and Chukinas could not have acted jointly in state action (as there was none). Therefore this scenario is of no help to Harvey. The second scenario–in which Chukinas chose to act with the permission of Dombroski–is not materially different from the

15

first, as the action is not coerced.  See supra note 6.

This leaves the last scenario, under which Dombroski ordered Chukinas to open the door.  Chukinas argues that, unlike in cases in which private parties have been found to have acted jointly with state actors, she did not direct Dombroski to do anything nor did she request his assistance with anything.  Moreover, she argues, she had no personal interest in getting the door opened, unlike, for example, Latshaw's use of the constable in Abbott.

The Supreme Court's language requiring joint action or action in concert suggests that some sort of common purpose or intent must be shown.  See Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 942 (1982) (finding that "[t]he Court of Appeals erred in holding that in this context 'joint participation' required something more than invoking the aid of state officials to take advantage of state-created attachment procedures" (emphasis added)).  Although the facts of this situation appear to render Chukinas a "participant," they do not suggest that she was a willful participant.  Price requires willful participation; a private citizen acting at the orders of a police officer is not generally acting in a willful manner, especially when that citizen has no self-interest in taking the action. See Black's Law Dictionary 1593 (defining "willful" as "[v]oluntary and intentional, but not necessarily malicious"); see also United States v. Cheape, 889 F.2d 477, 478 (3d Cir. 1989) (noting that the jury found that the defendant's "actions were wilful, and not the product of coercion or duress").  For the reasons just discussed, we believe that the willful participation required under Price means voluntary, uncoerced participation.  See Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 838 (9th Cir. 1999) ("[W]e would expect that the private defendant is not responsible for the government's compulsion.").  Chukinas would therefore not be liable here because she had not willfully participated in the state action, as compulsion by the state negates the presence of willfulness.[13]

_____

[13]We stress that by stating that a private actor is not engaged in state action simply because she is compelled to take an action by

16

Harvey points out that, in <u>Reitz v. County of Bucks</u>, we noted that "[o]ther courts have recognized that conduct as seemingly benign as towing a vehicle at the direction of a police officer can result in § 1983 liability for a private defendant." 125 F.3d 139, 148 (3d Cir. 1997) (citing <u>Goichman v. Rheuban Motors, Inc.</u>, 682 F.2d 1320, 1322 (9th Cir. 1982)). The situation described in <u>Goichman</u>, however, arose within a detailed statutory scheme empowering the towing companies that was created by the state to accomplish its own prerogatives with respect to traffic regulation. Also, <u>Goichman</u> concerned whether the towing could be considered state action, not whether suit could be brought against the private trucking companies.[14] <u>See</u> <u>supra</u> note 11. Accordingly, under no possible factual scenario presented here could we conclude that Chukinas engaged in state action. We will therefore affirm the grant of summary judgment in her favor.

## IV. The Township and Chief of Police

Harvey makes failure to train claims against the Township

a state actor, we are not suggesting that the action itself may not be attributed to the state. Indeed, it seems entirely proper to find that the state actor engaged in state action, including whatever actions the private party was compelled to undertake. <u>See</u> <u>Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n</u>, 531 U.S. 288, 296 (2001) ("We have, for example, held that a challenged activity may be state action when it results from the State's exercise of 'coercive power' . . . ."). For example, in this case, although Chukinas in fact unlocked the door, that action is imputed upon Dombroski because he used his state authority to cause that action.

[14]We note also that when private parties enter into symbiotic relationships with the government that "confer[] on each an incidental variety of mutual benefits," their conduct may become so inextricably intertwined with the state action that the private conduct may result in § 1983 liability. <u>Burton v. Wilmington Parking Auth.</u>, 365 U.S. 715, 724-25 (1961). Here, however, Chukinas was <u>not</u> in a symbiotic relationship with Dombroski, as there was no relationship between her and Dombroski that conferred benefits upon either of them.

17

and the Chief of Police. The District Court dismissed both claims on summary judgment, finding, among other things, that Harvey failed to offer any evidence of deliberate indifference on the part of either the Township or the Police Chief. See Muhlenberg, 269 F.3d at 215 ("A municipality's failure to train its police officers can subject it to liability, however, 'only where [it] reflects a "deliberate" or "conscious" choice by [the] municipality–a "policy" as defined' in Supreme Court cases.") (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)); id. at 216 ("[T]he plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a 'relationship between the "identified deficiency" and the "ultimate injury."'") (quoting Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)). After carefully considering Harvey's arguments and reviewing the record, we find no reason to overturn the District Court's judgment as to the Township and the Chief of Police.

## VI.

For the reasons discussed above, we will affirm the District Court's grant of summary judgment in favor of Chukinas, Plains Township, and Chief Walsh. However, we will reverse the grant in favor of Officer Dombroski and remand for proceedings consistent with this opinion.

BECKER, *Circuit Judge*, concurring in part and dissenting in part.

I join in Parts I, II.A and II.B, III, and IV of the majority opinion.[15] However, I dissent from Part II.C because I believe

---

[1] I join in Part II.A and B with considerable misgivings. Although there is some evidence in the record that Dombroski "ordered" Chukinas to open the door, the great weight of the testimony, from both Chukinas and Dombroski, is that Dombroski did not give an "order" but merely told Chukinas that "she could open the door." I strongly suspect that a jury will find that there was no "order," and, if there was not, there was likely no state action, as the majority notes in footnote 6 of its opinion. At all events, this case is a far cry from *Abbott v. Latshaw*, 164 F.3d 141 (3d Cir. 1998), on which the majority

18

that Officer Dombroski was entitled to qualified immunity.

At the summary judgment stage, we must begin the qualified immunity analysis by determining whether, viewing the evidence in the light most favorable to the plaintiff, "the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If such facts establish a violation, then, under the second step of the analysis, we must ask whether the "right was clearly established." *Id.*

It is undisputed that "the Fourth Amendment prohibited unreasonable searches and seizures of a person's home by the police without a warrant." Maj. Op. at 10-11; *see also Payton v. New York*, 445 U.S. 573, 585 (1980) ("'[T]he chief evil against which the . . . Fourth Amendment is directed'" is warrantless entry and search of home"). While this general proposition, on which the majority relies, may be enough for the first step of the qualified immunity analysis, the majority's characterization of the "right" in question is framed with insufficient particularity to determine whether it was "clearly established" under the second step. *Saucier*, 533 U.S. at 201-02. Rather, to find that a right was "clearly established," "the right allegedly violated must be defined at the appropriate level of specificity." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). In a fact-bound Fourth Amendment situation, "the right the official is alleged to have violated must have been 'clearly established' *in a more particularized*, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (emphasis added). In other words, we must inquire "whether a reasonable officer *could have believed* [that his or her conduct] was lawful, in light of clearly established law and the information the [officer] possessed." *Id.* at 641 (emphasis added).

The majority misapplies the *Anderson* standard. Instead, it simply concludes it was *not reasonable* for Dombroski to believe that Harvey consented or that the PFA was sufficient authorization for him to allow (or direct) entry into the apartment. *Anderson*, however, posits a more forgiving inquiry

so heavily relies, where the action of the police officer was significantly more aggressive and heavy-handed.

19

even at the summary judgment stage.

In my view, Officer Dombroski certainly could have believed that his conduct was lawful in light of the information in his possession. Dombroski was aware that Olowiany's attorney had written two letters to Harvey, the first asking her to set a time for Olowiany to retrieve his remaining property (and enclosing an itemized list of that property), and the second stating that on September 18, 1999, at 2:00 p.m., Olowiany would arrive to retrieve his belongings accompanied by a Plains Township police officer. The letters were copied to the Police Department and Chukinas. Although Harvey claimed in her deposition that she was residing elsewhere at the time and that she never received the second letter, Dombroski had no reason to know that, and this post hoc representation rings hollow in view of the fact that her possessions were still in the apartment (including the ones that she claims that Olowiany "trashed" or purloined). Moreover, under Third Circuit law there is a presumption that a properly mailed item was received by the addressee, *see In re Cendant Corp. PRIDES Litig.*, 311 F.3d 298, 304 (3d Cir. 2002), and I do not see why Dombroski could not rely on that presumption.

The majority states that Dombroski had no reason to believe that Harvey had received the letter or consented to the repossession, and even goes on to say that a reasonable officer should have determined whether consent was given by Harvey for the repossession and refused to assist in the opening of the door until he was satisfied that consent was given. Pray tell how this local police officer sent on short notice to keep the peace at what he understood to be a long prearranged appointment could satisfy the majority's prescriptions? *Cf. Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990) ("It is apparent that in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable . . . We see no reason to depart from this general rule with respect to facts bearing upon the authority to consent to a search.").

Additionally, Dombroski knew that the PFA, which granted Harvey exclusive possession of the apartment, also

20

permitted Olowiany to pick up his personal belongings from the apartment. The PFA could be interpreted as obviating the need for Harvey's consent.[16] There has been sharp disagreement among the Courts of Appeals as to whether it was clearly established, as of 1999, that an officer may not rely on a writ of replevin, writ of assistance, or other similar order to enter private property. *Compare Specht v. Jensen,* 832 F.2d 1516, 1525 (10th Cir. 1987) (finding no qualified immunity where the officers relied on a writ of assistance) *and Audio Odyssey, Ltd. v. Brenton First Nat'l Bank*, 245 F.3d 721 (8th Cir. 2001) *judgment vacated and then reinstated in full by* 286 F.3d 498 (8th Cir. 2002) (en banc), *with In re Foust*, 310 F.3d 849, 859 (5th Cir. 2002) (holding it was not clearly established, as of 1998, that officers could not occupy the entire premises in order to retrieve property located inside the premises) *and Salzer v. Dellinger*, 1995 WL 283986 (7th Cir. April 21, 1995) (unpublished opinion) (holding that it was not clearly established as of 1989 that an order of possession was not a substitute for a warrant). The PFA presents an even stronger case for permitting entry than a writ of replevin, assistance, or an order of possession, because the property in question was formerly leased to *both* Olowiany and Harvey, and the PFA served the dual purpose of allocating the right of possession to Harvey *and* of permitting Olowiany to retrieve his personalty. In light of the disagreement among the circuits and the contradictory prescriptions in the PFA, I do not believe it was clearly established that Dombroski could not reasonably rely on the PFA to enter Harvey's apartment without a warrant or Harvey's consent.

Finally, Dombroski was acting on the orders of his sergeant. While it is typically no defense for an officer to claim he was simply "following orders," *Villanueva v. George*, 659 F.2d 851, 855 (8th Cir. 1981) (en banc), "[p]lausible instructions from a superior or fellow officer" can "support qualified immunity where, viewed objectively in light of the

---

[2] The contradictory commands in the PFA appear to me to have been the true origin of the problems in this case. The alleged intrusion into Harvey's apartment and this ensuing litigation might have been avoided if the Common Pleas judge had made clear exactly how and when Olowiany was to retrieve his property from Harvey's apartment.

surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists." *Bilida v. McCleod*, 211 F.3d 166, 174-75 (1st Cir. 2000); *see also Lauro v. Charles*, 219 F.3d 202, 216 n.10 (2d Cir. 2000). The sergeant's order in this case could have given Dombroski an additional basis for believing that the necessary arrangements were made for proper entry into Harvey's apartment

In sum, relying on the two letters from Olowiany's attorney, the PFA, and the orders from his supervisor, Dombroski could have reasonably believed either that Harvey consented to the entry or that the PFA authorized it. Under these circumstances, I believe that Dombroski's willingness to tell Chukinas that she could open the door was reasonable, and that he should be granted qualified immunity.