NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-1873
_____

DOMINIK WEBER

Appellant

v.

PNC INVESTMENTS, a Delaware Limited Liability Company

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2:19-cv-704)
Judge:  Hon. Mark R. Hornak, Chief Judge

_____

Submitted Under Third Circuit LAR 34.1(a)
On January 28, 2021

Before: JORDAN, MATEY, *Circuit Judges*, and BOLTON,* *District Judge*.

(Opinion Filed:  February 3, 2021)
_____

OPINION**

_____

---

* The Honorable Susan Bolton, Senior United States District Judge for the District of Arizona, sitting by designation.

** This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

After Dominik Weber was fired from his job at a bank subsidiary, the subsidiary filed a form with the Financial Industry Regulatory Authority ("FINRA") indicating that Weber was terminated for dishonesty while working with securities. He believed that to be an unfair description with the effect of blackballing him from further employment in the "securities/finance industry." (Opening Br. at 6.) He accordingly submitted for arbitration several tort claims against his former employer, but he lost. He now seeks a second bite at the apple, asking that we vacate the arbitrators' decision on two grounds that were not raised during arbitration. He argues first that two of his arbitrators were misrepresented to be people without significant ties to the finance industry when they actually were industry insiders, and second that his employer's actions violated his due process rights under the Pennsylvania Constitution. For essentially the reasons well explained by the District Court, Weber's bid fails, since his misclassification claim comes too late and his state constitutional claim lacks merit.

## I.    BACKGROUND

Weber was hired by PNC Bank, N.A. ("PNC Bank") as a teller and was later promoted to work as a financial sales consultant for a subsidiary of the bank, PNC Investments ("PNCI"). In a step toward further promotion, Weber received PNCI's endorsement to take the FINRA licensing exams necessary to become a Financial Specialist. PNCI also filed a Uniform Application for Securities Industry Registration,

Form U4 with FINRA, on behalf of Weber. Pursuant to Form U4, Weber agreed to arbitrate disputes resulting from his employment.[1]

Unfortunately, the need for arbitration arose. Weber was fired after PNCI determined that he had "twice lied to his Branch Manager." (App. at 810.) It then notified FINRA of the firing using a Uniform Termination Notice for Securities Industry Registration, Form U5, which is stored in FINRA's Central Registration Depository for public accessibility. In that form, PNCI noted that Weber "was terminated for being dishonest with his manager regarding his attendance and completion of sales documentation," (App. at 698,) and it responded "Yes" to question 7F(1) on that form, which reads, "was the individual discharged . . . after allegations were made that accused the individual of … violating *investment-related* statutes, regulations, rules or industry standards of conduct?" (App. at 701, 703.)

Weber's attorney asked that the Form U5 be amended and PNCI agreed, changing its response to "No" to question 7F(1) and revising its termination explanation to say: "Dominik Weber's employment was terminated due to violation [of] firm policy – not securities related. Specifically, Mr. Weber was terminated for misrepresenting facts regarding his attendance and completion of sales documentation." (App. at 709, 711.)

---

[1] Specifically, he agreed "to arbitrate any dispute, claim or controversy that may arise between me and my *firm* … that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs [i.e., self-regulatory organizations] indicated in Section 4 (SRO REGISTRATION) as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent *jurisdiction*." (App. at 694, Part 15A, ¶ 5.)

FINRA disagreed with that revision, so PNCI changed the answer to question 7F(1) back to "Yes." (App. at 717.)

Weber then commenced a FINRA arbitration against PNCI. He asserted that the "Yes" answer to question 7F(1) effectively prevented him from obtaining similar employment, and he framed his complaint in three claims: "defamation"; "intentional interference with prospective contractual relations"; and "equitable/injunctive relief[.]" (App. at 737-41.) As relief, he requested "expungement of the false and defamatory [Form] U5 language[,]" as well as over a million dollars in compensation, costs, attorneys' fees, and punitive damages. (App. at 742-43.)

FINRA notified the parties of their rights regarding arbitrator selection and provided disclosure reports with each of the thirty potential arbitrators' background information, including the two arbitrators to whom Weber now objects, William Ryan and chairperson Gregory Mathews. Arbitrators can be removed from handling a dispute, if there is a showing of bias or there has been a failure to disclose required background information,[2] and parties have the right to request additional information about the arbitrators.

_____

[2] In particular:

> Before the commencement of any hearing or pre-hearing conference, … FINRA will grant a party's request to remove an arbitrator if it is reasonable to infer that the arbitrator is biased, lacks impartiality, or has a direct or indirect interest in the outcome of the arbitration. … After the commencement of the hearing, FINRA will remove an arbitrator only if the arbitrator fails to disclose required information not previously known by the parties.

(App. at 747.)

4

Mathews's disclosure report, dated April 10, 2017, stated that he had worked as Wachovia Corporation's Senior Vice President/House Counsel from 1994 through 2004 and, before that, he was an SEC Attorney/Special Counsel from 1978 through 1982.[3] Ryan's report was also dated in April 2017 and noted his employment as Director of Employee Relations at Cummins Engine Company from 1978 to 1983 and as Chairman and CEO of Point Spring & Driveshaft Company from 1983 to the then-present. Shortly thereafter, FINRA informed the parties of the arbitrator selections, based on the parties' ranking of submissions. The selections, per FINRA rules, included two arbitrators (Mathews and Ryan) classified as "public," i.e., as not being a finance industry insider, and one classified as non-public, i.e., as working within the finance industry.[4]

Then, on June 13, 2017, the parties were provided an additional disclosure from Ryan in which he revealed that he personally had bank accounts with PNC Bank, that the company he led as Chairman and CEO used PNC Bank for certain banking needs, and that his son worked at PNC Bank as a teller and, later, as an operations analyst Ryan stated, however, "that these facts [would] not preclude [him] from rendering an objective and impartial determination in this matter." (App. at 769-81, 1115.) A further updated disclosure report for Ryan was sent to Weber on June 21, 2017, with no changes related to PNC Bank, and Weber did not request Ryan's removal or any more information.

---

[3] On January 8, 2019, FINRA provided an updated report for Mathews, which added that he was counsel in an unrelated securities matter from 2014 to 2016.

[4] The classification and participation of the third arbitrator is not at issue.

The arbitration hearing took place more than a year and a half later, from January 28 to 31, 2019. During that hearing, Ryan advised the parties that his disclosure report remained accurate. At the end of the hearing, Weber's attorney confirmed, in response to a panel inquiry, that there was no "reason why this Panel should not be confirmed[.]" (App. at 797.) One week after the hearing, FINRA informed the parties that Ryan's son continued to be employed with PNC Bank. Then, a few days later, the case administrator for the arbitration notified the parties that Ryan's classification for future arbitration panels had changed from public to non-public. The letter stated, "[i]f you have any questions, please do not hesitate to contact me at [phone number] or by email[.]" (App. at 1142.) Weber did not do so. On March 18, 2019, the arbitration panel denied Weber's claims. (App. at 209-11, 214.)

Weber filed a motion in the District Court invoking the Federal Arbitration Act (FAA) and seeking to vacate the arbitrators' decision. He made the same two arguments he puts before us now, neither of which was raised before or at the arbitration. First, he complained that Mathews and Ryan were misclassified as public arbitrators when they should have been designated as non-public. Second, he claimed that PNCI's Form U5 filing, responding "Yes" to question 7F(1), violated his right to due process under the Pennsylvania Constitution. The District Court denied the motion for vacatur and granted PNCI's cross-motion to confirm the arbitration decision. *Weber v. PNC Invs. LLC*, No. 2:19-cv-00704, 2020 WL 563330, at *14 (W.D. Pa. Feb. 5, 2020). It held that Weber had waived his right to object to the alleged misclassification and found meritless his state

6

constitutional claim. *Id.* at \*8-14. Weber moved for reconsideration, which was denied.

He then appealed to us.[5]

## II.    DISCUSSION[6]

We are no more persuaded than was the District Court by Weber's arguments,

which we address in turn.

### A.    Misclassification of Arbitrators

Weber argues that because arbitrators Mathews and Ryan should have been

classified as non-public but were presented as being public members of the panel, his

award should be vacated under § 10(a) the FAA, which allows vacatur "where there was

evident partiality or corruption in the arbitrators" or "where the arbitrators were guilty of

… any other misbehavior by which the rights of any party have been prejudiced."

9 U.S.C. § 10(a). Because he took no action until after he received a negative result,

despite having ample opportunity to object previously, he has waived any claim under

---

[5] PNCI attempts to frame Weber's appeal, given its timing, as one that only challenges his motion for reconsideration. It contends that any appeal of the District Court's initial February 5, 2020 order is untimely. For that reason, PNCI says we should only consider those issues argued in Weber's motion for reconsideration, and for abuse of discretion at that. We agree with Weber that, "[p]ursuant to Rule 4(a)(4)(A), a timely motion for reconsideration will toll the time for filing a notice of appeal." (Reply Br. at 1.) *See United States v. Fiorelli*, 337 F.3d 282, 288 (3d Cir. 2003) (holding that a timely motion for reconsideration will toll the appeal deadline under Rule 4(a)(4)(A)). And Weber did not file multiple Rule 4(a)(4) motions, as PNCI suggests, as a basis for finding untimeliness.

[6] The District Court had subject matter jurisdiction under 28 U.S.C. § 1332(a) and we have jurisdiction under 28 U.S.C. § 1291. We review a district court's denial of a motion to vacate an arbitration award *de novo*, with regard to its legal conclusions, and for clear error, with regard to its factual findings. *See Whitehead v. Pullman Grp., LLC*, 811 F.3d 116, 119 n.23 (3d Cir. 2016).

7

§ 10(a). *See Goldman, Sachs & Co. v. Athena Venture Partners, L.P.*, 803 F.3d 144, 148 (3d Cir. 2015) ("[W]here a party is capable of 'thoroughly and systematically digging for dirt on each of the three arbitrators,' it should do so prior to being solely motivated by the chance of vacating the award.") (citation omitted); *see also Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 683 (7th Cir. 1983) ("That it did so little [investigating] suggests that its fear of a prejudiced panel is a tactical response to having lost the arbitration.").

### 1. *Chairman Mathews*

Weber asserts that Mathews failed to disclose that he performed certain in-house legal work for a broker dealer.[7] The information supporting this claim was found on Mathews's website, which, if it differs at all from his FINRA background disclosure, does so only subtly.[8] While Mathews's FINRA background notes that he was general counsel for Wachovia Corporation, his website adds that in that role, "he managed an active docket of over 300 cases covering a broad range of claims, including . . . SEC and [National Association of Securities Dealers ("NASD") – the predecessor of FINRA –] claims." (App. at 515.) FINRA Rules 13402(b) and 13403(b)(2) require the chair of the arbitration panel be a public member, not an industry insider. According to Weber, the work Mathews performed at Wachovia makes his disclosure false, and the District Court erred in concluding that Weber had waived a misclassification claim.

---

[7] In particular, Mathews answered "no" to the question: "Are you, or were you ever, associated with … a broker or a dealer?" (App. at 506.)

[8] PNCI disputes whether his website is materially different from his FINRA disclosure statement. We will assume for the sake of argument that they are different.

In *Goldman, Sachs & Company v. Athena Venture Partners, L.P.*, we concluded that constructive knowledge of an issue suffices for the issue to be waived if there is a failure to raise it during arbitration. *See* 803 F.3d at 150. "Constructive knowledge in the arbitration context reasonably requires parties to exercise as much diligence and tenacity in ferreting out potential conflicts in selecting the panel as they do once attacking the award [becomes] the sole reason to research the arbitrators." *Id.* at 148 (internal quotation marks and modifications omitted). Weber attempts to restrict the impact of *Athena Venture*, arguing that it should be cabined to its facts, where "there was 'alarming information' about ethical issues that put the 'sore loser' on inquiry notice to conduct further research."[9] (Opening Br. at 23 (quoting *Athena Venture*, 803 F.3d at 149, 150).) He argues that because there were no comparable red flags with regard to Mathews, he did not need to conduct any significant pre-award inquiry. But such a duty exists under *Athena Venture*, regardless of red flags.

Weber both could have and should have looked into Mathews's background before the hearing and arbitration decision, not after. He does not suggest that he discovered this supposedly new information through anything other than a simple background check, and though this is something he says he should not have been expected to do before the award, our precedent says otherwise.

---

[9] One of the arbitrators in *Athena Venture* had ethical charges brought against him, which were revealed prior to completion of the arbitration hearings, and a deeper inquiry would have revealed various felonies. *See* 803 F.3d at 146.

2. *Arbitrator Ryan*

For some reason not apparent in the record, FINRA reclassified Ryan as a non-public arbitrator shortly after Weber's arbitration hearing but nearly a month prior to the award. Based on that reclassification, Weber contends that Ryan must have been misclassified at the time he participated in the arbitration. The District Court concluded that "despite FINRA's late-in-the-game reclassification, Weber still could and should have objected to Ryan's participation." (App. at 27.) We likewise hold that Weber's failure to object constitutes waiver. Moreover, his claim is based on pure speculation and would have no merit even had it been preserved. *See Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008) (concluding that the avenues available for overturning an arbitration award "address egregious departures from the parties' agreed-upon arbitration" and "extreme arbitral conduct"); *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 238-39 (3d Cir. 2005) ("[A] court must … interfere only when an [arbitration] award is severely problematic." (citation omitted)).

Weber argues that, at the time of the reclassification, there was no "rule / mechanism that would have permitted him to seek reconsideration of the [FINRA] Director's decision to keep Ryan on the panel[.]" (Opening Br. at 29.) Specifically, Weber argues the District Court was mistaken that FINRA Rule 13410(b) provides such a mechanism because, he says, the reclassification decision was a final determination by

FINRA.[10]  For that reason, according to Weber, he could not have brought his claim any earlier.

His argument misses the mark.  Weber was told that, as a matter of FINRA policy, Ryan would be reclassified for future arbitrations.  At the same time, he was told to contact the case administrator with any questions.  He ignored that offer.  A reasonably diligent inquiry would have, at the very least, involved responding to the reclassification note to request information on Ryan's status change and then perhaps objecting to Ryan's continued service on his panel, if there was a valid basis to object.  We do not know why Ryan was reclassified, and evidently neither does Weber, so even if the claim were not waived, we would not assume error by FINRA based on Weber's speculation.  *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85 (2002) (delegating certain questions of arbitrability to the NASD because it possesses expertise).

Whether or not Weber's interpretation of Rule 13410(b) is sound, the fact remains that he was given a procedure to investigate and declined to do so.  Consequently, he has waived his claim.

---

[10] Rule 13410(b) provides that, "[a]fter the first hearing session begins, the Director may remove an arbitrator based only on information required to be disclosed … that was not previously known by the parties.  The Director may exercise this authority upon request of a party or on the Director's own initiative."

## B. Violation of the Pennsylvania Constitution[11]

Weber broadly asserts that "FINRA's Form U5 statutory scheme, i.e., its database, … violates the Pennsylvania Constitution[,]" and in particular the fundamental right to "reputation."[12]  (Opening Br. at 36-37 (citation omitted).)  If for no other reason than that both FINRA and PNCI are not state actors, this claim plainly lacks merit.

Under the Pennsylvania Constitution, a person's right to reputation is "a fundamental interest which cannot be abridged without compliance with constitutional standards of due process[.]"  *R. v. Commonwealth, Dep't of Pub. Welfare*, 636 A.2d 142, 149 (Pa. 1994) (citation omitted).  To bring a viable claim for a Pennsylvania due process violation, Weber had to show that the party whose actions he is complaining about is a state actor.  *See Commonwealth v. Nat'l Gettysburg Battlefield Tower, Inc.*, 311 A.2d 588, 591 (Pa. 1973); *accord Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 195 (3d Cir. 1995) ("Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of [§ 1983]." (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)).  As the District Court noted, "every court to examine the issue

---

[11] Weber's motion to vacate was brought under diversity jurisdiction, 28 U.S.C. § 1332, and the state constitutional claim was brought under supplemental jurisdiction, 28 U.S.C. § 1367, as part of "the same case or controversy."  The parties do not appear to have contested the District Court's supplemental subject matter jurisdiction to hear the claim, and the Court did not decline to exercise its jurisdiction.  It would, however, likely have been within its discretion to do so, because "the claim raise[d] a novel or complex issue of State law" and because the Court had "dismissed all claims over which it ha[d] original jurisdiction."  28 U.S.C. § 1367(c).

[12] Specifically, Weber explains that FINRA's "refusal to expunge his [Form U5] violates his right to reputation as guaranteed by Article I, Section 1 of the Pennsylvania Constitution[.]"  (Reply Br. at 20 (citing *Carlacci v. Mazaleski*, 798 A.2d 186, 188-89 (Pa. 2002)).)

has held that FINRA is not a state actor" and "even if FINRA was a state actor, [PNCI] – unquestionably a private company – would not become a state actor simply by submitting paperwork to FINRA[.]" (App. at 31 (citations omitted).) We agree and have said as much previously. *See First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 699 n.5 (3d Cir. 1979) ("NASD is not a state agency[.]").

Weber attempts to avoid these prior decisions by narrowly arguing that it is the database of U4 and U5 Forms maintained by FINRA that is effectively a state actor, and PNCI's filing of Weber's U5 Form constitutes state action. (*See* Reply Br. at 22 ("[W]hat is being challenged is the maintenance of the … database itself, and the constitutionally impermissible blackening of a person's reputation without any process at all[.]").) The argument is still unavailing.

Undertaking an action that loosely parallels actions that the state can undertake, such as maintaining a database of employees in the finance field and noting reasons for termination, does not convert private action into state action. *See Leshko v. Servis*, 423 F.3d 337, 340 (3d Cir. 2005) (describing that there are two categories of state action, "an *activity* that is significantly encouraged by the state or in which the state acts as a joint participant" and "an *actor* that is controlled by the state, performs a function delegated by the state, or is entwined with government policies or management" (citations omitted)). That alone is sufficient to affirm the District Court's decision.

## III.    CONCLUSION

For the forgoing reasons, we will affirm the District Court's orders confirming the arbitration award and denying reconsideration.