

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-24-2007

# Curley v. Klem

Precedential or Non-Precedential: Precedential

Docket No. 05-4701

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Curley v. Klem" (2007). *2007 Decisions.* Paper 490.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/490

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-4701
_____

CORVET CURLEY;
ELAINE CURLEY

v.

RONALD KLEM, a Police Officer,
SUED IN HIS INDIVIDUAL CAPACITY;
JOHN DOE; BILL DOE,
two currently unknown Police
Officers also sued in their
individual capacities

Corvet Curley,

Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 98-cv-05256)
District Judge:  Honorable Katharine S. Hayden
_____

Argued March 27, 2007

Before:  FISHER, JORDAN and ROTH, *Circuit Judges*

(Filed: August 24, 2007)
_____

David S. Gould **[ARGUED]**
Steven L. Salzman
Richard L. Huffman
David S. Gould, P.C.
61 Broadway - Suite 2820
New York, NY 10006
    *Counsel for Appellant*

Jeffrey M. Kadish, Esq. **[ARGUED]**
Morgan Melhuish Abrutyn
651 West Mount Pleasant Avenue - # 200
Livingston, NJ   07039-1673
    *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

This civil rights suit, after a long and difficult history, is before us for the second time.  Plaintiff Corvet Curley ("Curley"), an officer with the Port Authority of New York

2

and New Jersey, and his wife, Elaine, sued defendant Ronald Klem ("Klem"), a New Jersey State Trooper, under 42 U.S.C. § 1983, alleging that Klem violated Curley's constitutional rights by shooting him while both Curley and Klem were responding to a police emergency at the George Washington Bridge. The Curleys appeal from a judgment order of the United States District Court for the District of New Jersey, entered after a jury trial. The jury made various findings of fact through special interrogatories, and stated by a verdict sheet its conclusion that Trooper Klem had not acted unreasonably under the circumstances. Based on those findings, the District Court entered judgment in favor of Klem on the basis of qualified immunity. For the reasons that follow, we will affirm, albeit on different grounds.

I.

A.      Factual Background

On the evening of November 20, 1997, at approximately 8:45 p.m., Trooper Klem was on duty and learned that a suspect, Deon Bailey ("Bailey"), had shot and killed a Long Branch police officer and stolen a police car. A follow-up radio transmission informed Klem that Bailey was on the Garden State Parkway and had fired shots at a another police car. Shortly after 9:00 p.m., Klem received another transmission, this one saying that Bailey was now in a green Toyota Camry he had stolen from a woman at a gas station. A few minutes later, a further radio transmission described

3

Bailey as a "tall, black male"[1] and stated that he was headed north in the Camry on the New Jersey Turnpike. Klem and several other troopers found Bailey on the Turnpike and began chasing him, while Bailey shot at them. One of the troopers in the chase was shot in the arm, and Klem's windshield was struck by a bullet.

During the chase, Klem ended up as the nearest trooper behind Bailey. He followed Bailey to the toll plaza at the George Washington Bridge, where, according to his testimony, he briefly lost sight of the Camry. He then saw the Camry stopped on the far left side of the plaza. Klem stopped his car about thirty yards back, and approached the Camry at a jog. He testified that he was unaware of any other police officers on the scene at that time, and that he did not wait for back-up.

Klem did not know that Bailey, upon arriving at the toll plaza, had crashed the Camry at high speed into a Nissan Pathfinder that was waiting in a toll lane. The crash sent the Pathfinder spinning out into the toll plaza some thirty feet from where the Camry had stopped. Immediately after the crash, Bailey shot himself in the head. According to a toll

---

[1] At the summary judgment stage of the case, Klem claimed that the radio transmission described Bailey as a "thin, black male" rather than a "tall, black male." *See Curley v. Klem*, 298 F.3d 271, 274 (3d Cir. 2002) ("*Curley I*"). However, at trial, Klem stated that the transmission had described the suspect as a "tall black male" and that he had misheard it as "thin black male."

4

booth attendant and another law enforcement officer, Bailey was sprawled across the passenger seat of the Camry. The toll booth attendant stated that he had no trouble seeing the body. That same attendant next saw the two principal parties in this dispute, Curley and Klem, approaching the ill-fated scene.

Curley was on duty that evening at the bridge. He was in his Port Authority police uniform, although not wearing his hat. He too had received a radio transmission stating that a black male in a stolen vehicle was being pursued by the New Jersey State Police, and was heading toward the bridge. By now it was nearing 9:30 p.m. Curley went to the New York side of the toll plaza in his marked police car, with both the lights and sirens on. After reaching the plaza, he turned his sirens off but left the lights on. He then saw a vehicle, which he later learned was the stolen Camry, headed toward the toll plaza at a high rate of speed, and he heard it crash into the Pathfinder.

Curley drove his car toward the Pathfinder and stopped next to it. He looked over at the Camry, but had trouble seeing inside of it because the front end was smashed. He unholstered his gun, told the driver of the Pathfinder to stay in his vehicle, and moved toward the Camry. Curley testified that, at this point, he had his gun pointed toward the Camry. Realizing that he did not have cover, Curley pointed his gun at the ground, turned and began to move back toward his own car.

At approximately the same time that Curley was investigating the scene, Klem approached the back of the Camry with a shotgun in hand. He saw a toll collector pointing toward the center of the toll plaza. Klem testified that he had not heard any shots, and that all of the doors on the Camry were closed. Klem approached the Camry from the back right, and stopped by the right front passenger door, close enough to the Camry to be able to touch it. He testified that, as he approached the Camry, he looked into the rear seat of the vehicle and into the front seat of the vehicle; he testified that the air bags had deployed, and that the interior of the Camry was filled with dust from the air bags. Klem stated that, at that time, he did not see a body in the Camry and did not see blood on the air bags or seat.

Klem turned in the direction that the toll collector had been pointing and saw a black male with a gun in his hand. According to Klem, the man had both hands on the gun and was pointing it directly at him. Klem testified that he shouted three times for the man with the gun, who was, in reality, Curley, to drop his gun. He also testified that Curley raised and lowered his gun to point at Klem three times while backpedaling away from Klem. Klem hesitated briefly, then fired his shotgun,[2] hitting Curley in the leg. Immediately after he fired, someone screamed to him that he had just shot a cop. Klem then looked into the Camry and saw Bailey's body.

---

[2] At his deposition, Klem testified that about thirty seconds passed between the time he first saw Curley and the time he fired his shotgun. At trial, he testified that only ten to fifteen seconds had passed.

Klem testified that, had he earlier seen the body in the Camry, he never would have shot Curley.[3]  Curley testified that he never saw Klem and that he never heard anyone tell him to drop his gun.

B.       Procedural Background

Curley filed suit under 42 U.S.C. § 1983, alleging that Klem used excessive force against him, in violation of the Fourth Amendment.[4]  Curley's wife joined in the complaint, alleging loss of consortium.  After discovery, the District Court granted summary judgment in favor of Klem.  It held that Klem's conduct was objectively reasonable and that he was thus shielded by qualified immunity.  *See Curley I*, 298

---

[3] It is undisputed that Bailey had been alone, and that Klem knew that.

[4]"To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) (citing *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989)).  An officer seizes a person whenever he "restrains the freedom of a person to walk away[.]" *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  Thus, there is "no question" that a shooting constitutes a seizure under the Fourth Amendment. *Id.* ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.").  The question that remains is whether the shooting was reasonable.

F.3d at 276 (recounting procedural history). Curley appealed, and we reversed the summary judgment. *See id*. at 273-74. In that opinion, we analyzed both the question of whether Klem's conduct had violated Curley's constitutional rights, and whether Klem was entitled to qualified immunity. We did so recognizing – indeed we reiterated it no less than four times in different ways – that, because we were reviewing a decision on a summary judgment motion, we were required to take the facts as Curley, the non-movant, had alleged them and to view every fact and inference in the light most favorable to Curley. *See id.* at 276-77; 279-80; 282-83. Given that procedural perspective, we determined that Klem's actions would constitute an unreasonable seizure. *Id*. at 280.

Next, we decided that, in the District Court's qualified immunity analysis, the Court had not recognized factual disputes that precluded a grant of summary judgment. *Id*. at 281. Specifically, we noted that a number of facts, including whether Klem looked inside the Camry and how Curley behaved during the confrontation between him and Klem, were disputed and required resolution by a jury. *Id*. at 281-83. Thus, we remanded the case to the District Court for resolution of the disputed facts by a jury. *Id*. at 283.

On remand, the District Court held a jury trial and submitted both special interrogatories and a liability verdict sheet to the jury. In answer to the special interrogatories, the jury found that, when Klem approached the Camry, Bailey's body was on the front seat of the car, not on the floorboards, and that Klem did not look into the window of the car. Furthermore, the jury found that Bailey's body should have

8

been visible to someone standing in Klem's position but that Klem had not made an objectively reasonable effort to look into the Camry. The jury also found that it was objectively reasonable for Klem to believe that the toll collector was signaling to the center of the plaza. Additionally, the jury found that Curley did not repeatedly point his gun at Klem, and that, when Curley was shot, he was not raising his gun to point it at Klem. Finally, the jury could not reach a unanimous decision and so did not answer whether Curley's police uniform was visible to someone in Klem's position or whether it was reasonable for Klem to believe that Curley was in civilian clothing.

In addition to the special interrogatories, the District Court submitted to the jury a liability verdict sheet asking whether Klem's conduct was objectively reasonable. *See Curley v. Klem*, 2006 WL 414093, at *2 (D.N.J. Feb. 21, 2006) ("*Post-trial Opinion*"). More precisely, the liability verdict sheet contained four questions, three of which the jury answered. Question One asked the jury whether "Trooper Ron Klem's failure to act in an objectively reasonable manner in observing the Camry prevent[ed] him from seeing the perpetrator's body in the Camry?" Question Two asked "Did Trooper Ron Klem act in an objectively reasonable manner in shooting Officer Curley during the confrontation?" Question Three asked "Was Trooper Ron Klem's mistake in firing his weapon objectively reasonable?" The fourth question, left unanswered by the jury, asked whether "the plaintiff suffer[ed] damages that were proximately caused by Trooper Ron Klem's conduct?"

9

The jury answered yes to Question One, thus finding that Klem's failure to look in the Camry was not objectively reasonable. However, the jury also found, in response to Question Two, that Klem did act in an objectively reasonable manner during the confrontation with Curley. Finally, in response to Question Three, the jury found that Klem's mistake in firing his weapon was objectively reasonable. Based on these findings, and with no separate analysis, the District Court entered judgment for Klem, stating that Klem was entitled to qualified immunity based on the jury's answer to Question Three, and also noting the jury's answer to Question Two.

Curley moved for judgment as a matter of law or a new trial.[5] In its opinion addressing those post-trial motions, the District Court stated that the parties had agreed early in the case "that the jury would decide the issue of qualified immunity, and not the Court." *Id*. at *4. On appeal, however, Curley points to several places in the record where he objected to the inclusion of Question Three on the liability verdict sheet and where he argued that a determination of qualified immunity was a question of law for the Court, not the jury. *See* Joint Appendix at A125 ("A jury can contribute fact finding to a qualified immunity question but not law finding"); Trial Transcript at T113 ("[Counsel for Klem] wants the jury to decide objectionable [sic] reasonableness

---

[5]For purposes of the following discussion, when we speak of Officer Curley taking certain legal positions, it should be understood that his wife and co-plaintiff has also taken those positions.

10

and then to decide whether there was a violation of the state of the law. Which you called the second prong on qualified immunity. And what is very clear is that no case ever did or could submit that to the jury."). Whether the District Court misunderstood Curley's position or Curley failed to make it clear during the framing of the special interrogatories and the verdict sheet, the objective reasonableness of Klem's actions was put to the jury.

In support of his post-trial motions, Curley argued that the jury's general liability verdict was not supported by the facts the jury had found in the special interrogatories and that the verdict should therefore be overridden. He also argued that the verdict could not stand because it was internally inconsistent, since it faulted Klem's action in not looking in the Camry and yet stated that Klem's behavior, including the mistaken shooting, was reasonable. The District Court found that the jury's verdict was not inconsistent, and that the facts found by the jury in the special interrogatories did not warrant overturning the jury's verdict for Klem. *Post-trial Opinion*, 2006 WL 414093, at *2-5.

The District Court reasoned that Curley was attempting to reduce the case "down to a handful of seconds in the continuum of events." *Id*. at *2. Rejecting that effort, the District Court found that the relevant events spanned a lengthy period, beginning at the time that Klem received the first radio transmission about Bailey. *Id*. Thus, the Court stated, although

11

those seconds discussed by the Third Circuit are important, still they were singled out not because they were "the case," but because this [District] Court erroneously saw them as unfolding only one way. That the jury decided otherwise, that it viewed some of the preshooting events contrary to Trooper Klem's account, does not necessarily drive a determination that he acted unreasonably when he mistakenly shot Officer Curley.

*Id.* The District Court therefore found that there was no inconsistency or tension between the jury's answers to the Special Interrogatories and its answers on the Liability Verdict Sheet. *Id.* Characterizing Questions One and Two as "General Liability" questions, the District Court held that those questions did not present alternative theories of liability. *Id.* at *5. The Court also held that the jury had decided in Question Three that Klem was entitled to qualified immunity. *Id.* at *3-5. Accordingly, the Court denied Curley's motion for judgment as a matter of law or a new trial. *Id.* at *5.

Curley then filed this appeal. He raises five questions, some of which are conceptually overlapping: (1) Whether the District Court erred in putting to the jury the question of the objective reasonableness of Klem's mistake in shooting Curley; (2) Whether the District Court erred in refusing to treat the jury's answers to special interrogatories as requiring a verdict for Curley; (3) Whether the District Court likewise erred in refusing to treat the jury's answer to the first question on the verdict sheet, which dealt with Klem's failure to see

12

Bailey's body in the Camry, as requiring a verdict for Curley (Curley calls this his "first theory of liability"); (4) Whether the District Court erred in refusing to enter a verdict for Curley or to order a new trial based on Klem's actions in the confrontation and shooting (Curley's "liability theory number two"); and (5) Whether the District Court erred in refusing to treat Curley's two liability theories as alternatives that necessitated a verdict for Curley if the jury agreed with either.

## II.

The District Court had jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343, and entered final judgment on September 29, 2005. This Court has jurisdiction over final judgments of the District Court under 28 U.S.C. § 1291.

The standard of review for a motion for judgment as a matter of law is plenary. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) ("We exercise plenary review of an order granting or denying a motion for judgment as a matter of law and apply the same standard as the district court."). The standard of review on a motion for a new trial is "abuse of discretion unless the court's denial of the motion is based on application of a legal precept, in which case our review is plenary." *Honeywell, Inc. v. American Standards Testing Bureau, Inc.*, 851 F.2d 652, 655 (3d Cir. 1988).

13

III.

A.      The *Saucier* Test for Qualified Immunity

As we noted in *Curley I*, the claim here arises under 42 U.S.C. § 1983, which "provides a cause of action for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law."  298 F.3d at 277.  Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity.  Qualified immunity is "the best attainable accommodation of competing values ... ." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).  Since public officials exercising discretionary powers may sometimes abuse their discretion, the immunity is qualified, rather than absolute, so that civil damages can serve as a restraint.  At the same time, the immunity incorporates a recognition that "claims frequently run against the innocent as well as the guilty – at a cost not only to the defendant officials, but to society as a whole." *Id.*  While unproductive societal costs may be unavoidable in a system that relies on private litigation as one means to enforce our constitutional norms, the aim of qualified immunity is to limit those costs to the greatest practical degree.  We do not want to let the threat of litigation and personal liability "deter[] ... able citizens from acceptance of public office[,]" nor do we want to "dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties." *Id.* (internal quotation marks, brackets, and citation omitted).  Hence, "[t]his immunity is broad in scope and protects 'all but

14

the plainly incompetent or those who knowingly violate the law.'" *Couden v. Duffy*, 446 F.3d 483, 501 (3d Cir. 2006) (Weis, J., dissenting) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court articulated a two step test for determining whether a government official, such as a police officer, is entitled to qualified immunity.[6] In the first step, a court must address whether "the officer's conduct violated a constitutional right[.]" *Id.* at 201. In an excessive force case, whether there is a constitutional violation is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard[.]" *Graham v. Connor*, 490 U.S. 386, 388 (1989). The relevant inquiry is "the reasonableness of the officer's belief as to the appropriate level of force[,]" which "should be judged from [the officer's] on-scene perspective," and not in the "20/20 vision of hindsight." *Saucier*, 533 U.S. at 205 (internal citations and quotation marks removed).

---

[6]*Saucier* was not the first time the Court had framed the analysis in two parts, *see Siegert v. Gilley*, 500 U.S. 226, 232 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."), but it is the decision that has become synonymous with the current approach to qualified immunity analysis.

15

That reasonableness inquiry requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. (citations and internal quotation marks omitted). The balancing must be conducted in light of the facts that were available to the officer. *See Maryland v. Garrison*, 480 U.S. 79, 85 (1987) ("[W]e must judge the constitutionality of [the officers'] conduct in light of the information available to them at the time they acted."). It is, in other words, a "totality of the circumstances" analysis. *See Curley I*, 298 F.3d at 279 (assessing objective reasonableness of defendant's actions on basis of totality of the circumstances); *cf. Graham*, 490 U.S. at 396 (proper application of reasonableness test used to analyze a claimed violation of Fourth Amendment right against unreasonable seizure "requires careful attention to the facts and circumstances of each particular case"); *Abraham*, 183 F.3d at 289 ("How much force is permissible to effectuate an arrest ... is determined based on the 'totality of the circumstances.'").

"If, and only if, the court finds a violation of a constitutional right," *Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007), the court moves to the second step of the analysis and asks whether immunity should nevertheless shield the officer

16

from liability.[7]  The question at this second step is whether the right that was violated was clearly established, or, in other words, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.  The Court explained that, again, "this inquiry ... must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*. at 201.  The Court went on to emphasize that even where reasonableness is a part of the inquiry for both the constitutional question and for qualified immunity, as it is in an excessive force case, the inquiries remain distinct. *Id*. at 204-05.  "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id*. at 205.

Thus, the first step of the analysis addresses whether the force used by the officer was excessive, and therefore violative of the plaintiff's constitutional rights, or whether it was reasonable in light of the facts and circumstances available to the officer at the time.  This is not a question of immunity at all, but is instead the underlying question of whether there is even a wrong to be addressed in an analysis of immunity.  The second step is the immunity analysis and addresses whether, if there was a wrong, such as the use of excessive force, the officer made a reasonable mistake about the legal constraints on his actions and should therefore be protected against suit

---

[7]As further explained herein, *infra* at sections IV.B and IV.C, we do not have occasion to reach that second step here, because no constitutional violation occurred in this case.

17

While the *Saucier* analytical approach has been criticized for being unduly rigid and demanding resolution of constitutional issues when cases could be more simply disposed of on other grounds, *see, e.g., Los Angeles County, California v. Rettele*, 127 S. Ct. 1989, 1994 (2007) (Stevens, J., dissenting) (discussing the "unwise practice of deciding constitutional questions in advance of the necessity for doing so."); *Scott*, 127 S. Ct. at 1774 n.4 (recounting criticisms of *Saucier*); P. Leval, *Judging Under the Constitution*, 81 NYU L. Rev. 1249, 1275-81 (2006) (describing *Saucier* as requiring courts to engage in "a puzzling misadventure in constitutional dictum"), its order of inquiry nevertheless remains mandatory. *Scott*, 127 S. Ct. at 1774 n.4 (declining to "address the wisdom of *Saucier*").

B.      Evolving Approaches to Applying the Test

The length of the foregoing review notwithstanding, the two-step *Saucier* test can be stated simply. Its application, however, presents perplexing logical and practical problems. The point of immunity is to protect someone from the burden imposed by litigation itself. It is supposed to be "an *immunity from suit* rather than a mere defense to liability ... ." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (original emphasis). Hence, the Supreme Court has instructed that "[i]mmunity ordinarily should be decided by the court long before trial." *Hunter v. Bryant*, 502 U.S. 224, 228, (1991). That is well and good when there are no factual issues in a case, but often the facts are intensely disputed, and our precedent makes clear that such disputes must be resolved by a jury after a trial. *E.g., Estate of Smith v. Marasco*, 430 F.3d 140, 152-53 (3d

18

Cir. 2005); *Curley I*, 298 F.3d at 278; *Reitz v. County of Bucks*, 125 F.3d 139, 147 (3d Cir. 1997). As a practical matter, then, in such cases the immunity becomes no more than a mere defense, *Sloman v. Tadlock*, 21 F.3d 1462, 1468 n.6 (9th Cir. 1994), and a sometimes challenging one to establish at that.

The fundamental challenge lies in the nature of the questions that compose the test. Since they are mixed questions of law and fact, one is left to ask who should answer them. As we noted in *Curley I*, "[a] disparity of opinion exists among our sister circuits as to whether a judge or jury should make the ultimate immunity determination." 298 F.3d at 278 n.3. The First, Fourth, Seventh, and Eleventh Circuits have all indicated that qualified immunity is a question of law reserved for the court.[8] The Fifth, Sixth,

_____

[8] *See Rodriguez-Marin v. Rivera-Gonzalez*, 438 F.3d 72, 83 (1st Cir. 2006) ("While preliminary factual questions regarding qualified immunity are sent to the jury, the legal question of the availability of qualified immunity is ultimately committed to the court's judgment.") (internal quotation marks omitted); *Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005) ("The issue having now come before us, we hold that the legal question of a defendant's entitlement to qualified immunity under a particular set of facts should be decided by the court, not by the jury."); *Riccardo v. Rausch*, 375 F.3d 521, 526 (7th Cir. 2004) ("Immunity, however, is a matter of law for the court, to be decided without deference to the jury's resolution-and preferably before the case goes to the jury."); *Johnson v. Breeden*, 280 F.3d 1308, 1318 (11th

Ninth, and Tenth Circuits have permitted the question to go to juries.[9]  Precedent from the Second and Eighth Circuits can be

_____

Cir. 2002) ("When the case goes to trial, the jury itself decides the issues of historical fact that are determinative of the qualified immunity defense, but the jury does not apply the law relating to qualified immunity to those historical facts it finds; that is the court's duty.").

[9] *See McCoy v. Hernandez*, 203 F.3d 371, 376 (5th Cir. 2000) ("while qualified immunity ordinarily should be decided by the court long before trial, if the issue is not decided until trial the defense goes to the jury which must then determine the objective legal reasonableness of the officers' conduct."); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) ("The issue of whether qualified immunity is applicable to an official's actions is a question of law.  However, where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability.") (internal citations and quotation marks omitted); *Ortega v. O'Connor*, 146 F.3d 1149, 1156 (9th Cir. 1998) (finding no error in "the district court's 'extra' reasonableness test, which ... constituted an appropriate and proper instruction to the jury on the second prong of the defendants' qualified immunity defense-whether a reasonable state official could have believed his conduct was lawful-the prong as to which the existence of factual disputes requires the jury's determination."); *Maestas v. Lujan*, 351 F.3d 1001, 1010 (10th Cir. 2003) ("In short, the disputed issues of material fact concerning the objective reasonableness of Mr. Lujan's

viewed as being on both sides of the issue, with the evolution being toward reserving the question for the court.[10]

_____

actions are dispositive of the qualified immunity issue. Further, as stated above, Mr. Lujan retained the defense of immunity from liability even though the jury was needed to resolve issues of objective legal reasonableness. Therefore, the district court properly presented the reasonableness element of the qualified immunity analysis to the jury.").

[10] *Compare Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) ("We believe that use of special interrogatories in this case resolves the difficulty of requiring the jury to decide 'what the facts were that the officer faced or perceived' and requiring the court to make the ultimate legal determination of whether qualified immunity attaches on those facts.") with *Oliveira v. Mayer*, 23 F.3d 642, 650 (2d Cir. 1994) ("The District Court should have let the jury (a) resolve these factual disputes and (b) based on its findings, decide whether it was objectively reasonable for the defendants to believe that they were acting within the bounds of the law when they detained the plaintiffs."); *see also Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) (discussing roles of judge and jury in qualified immunity analysis, and citing both *Stephenson* and *Oliveira*). *Compare Littrell v. Franklin*, 388 F.3d 578, 585 (8th Cir. 2004) ("Where, as in this case, factual questions prevent a district court from ruling on the issue of qualified immunity, it is appropriate to tailor special interrogatories specific to the facts of the case. This practice allows the jury to make any requisite factual findings that the district court may then rely upon to make its own qualified

21

Our precedents too have evolved. Our recent precedents say that the court, not a jury, should decide whether there is immunity in any given case. *E.g., Harvey v. Plains Twp. Police Dept.*, 421 F.3d 185, 194 n.12 (3d Cir. 2005); *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004); *Doe v. Groody*, 361 F.3d 232, 238 (3d Cir. 2004). But that was not always our counsel. We had previously permitted the jury to answer the key immunity question of whether the challenged behavior of a government official was objectively reasonable. In *Sharrar v. Felsing*, 128 F.3d 810, 830-31 (3d Cir. 1997), we referred with approval to our earlier decision in *Karnes v. Skrutski*, 62 F.3d 485 (3d Cir. 1995), characterizing it as holding that, "a factual dispute relating to qualified immunity must be sent to the jury, and suggest[ing] that, at the same time, the jury would decide the issue of objective reasonableness." *Sharrar*, 128 F.3d 830-31.

─────────────────

immunity ruling. Special interrogatories related to the qualified immunity defense are not improper per se, but they must be carefully crafted so that the fact-finder's role is limited to determining whether the underlying facts are as the plaintiff has alleged or proved.") (internal citations and quotation marks omitted) *with Turner v. Arkansas Ins. Dept.*, 297 F.3d 751, 754 (8th Cir. 2002) (in discussing an official's burden to come forward with "undisputed and material facts that demonstrate that his actions were reasonable under the circumstances[,]" the Court stated that "[i]f such facts are undisputed, then that is a question of law to be reviewed by a court; if not, then it is a question for a jury and summary judgment is improper.")

22

Later, in *Curley I*, we cited *Sharrar* for the proposition "that a jury can evaluate objective reasonableness when relevant factual issues are in dispute."[11] 298 F.3d at 279. We also went on to say, however, that it would not be inappropriate "for a judge to decide the objective reasonableness issue once all the historical facts are no longer in dispute[,]" and we suggested the use of special interrogatories as a means to that end. *Id.*

Finally, in a line of cases beginning with *Doe v. Groody*, we began highlighting that "qualified immunity is an objective question to be decided by the court as a matter of law." *Carswell*, 381 F.3d at 242 (citing *Doe*, 361 F.3d at 238). In *Carswell*, we elaborated on that point. We explained that the jury "determines disputed historical facts material to the qualified immunity question[,]" and we again suggested that "District Courts may use special interrogatories to allow juries to perform this function," *id.* (citing *Curley I*, 298 F.3d at 279). We emphasized that "[t]he court must make the ultimate determination on the availability of qualified immunity as a matter of law." *Id.* That emphasis reemerged in *Harvey*, when we cited *Carswell* and *Doe* for the

---

[11] We are not suggesting that the objective reasonableness of an officer's view of the law may be submitted to the jury. Rather, we are recognizing that, when material issues of fact are in dispute, our past precedents, in particular *Karnes*, *Sharrar*, and *Curley I*, have allowed the jury to resolve those disputes and also to determine the objective reasonableness of the officer's conduct in light of the facts.

23

proposition that qualified immunity is purely a question of law to be answered by the court. 421 F.3d at 194 n.12.

It appears that much of the discussion in *Carswell* was dicta, since we were actually affirming in that case the grant of judgment for the defendant as a matter of law, following the presentation of the plaintiff's case at trial. 381 F.3d at 239, 245. In a technical sense, then, the dicta is not binding. *See Abdelfattah v. United States Dept. of Homeland Security*, 488 F.3d 178, 185 (3d Cir. 2007) ("While '[i]t is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels,' Internal Operating Procedure 9.1, it is also well established that we are not bound by dictum in an earlier opinion.") (citing *Mariana v. Fisher*, 338 F.3d 189, 201 (3d Cir. 2003)). It has nevertheless been repeated and understood as a definitive direction on the respective roles of judge and jury when a qualified immunity defense is raised. *See, e.g., Johnson v. Anhorn*, 416 F. Supp. 2d 338, 361 (E.D. Pa. 2006) ("[Q]ualified immunity is an objective question to be decided by the court as a matter of law... . The jury, however, determines disputed historical facts material to the qualified immunity question.") (quoting *Carswell,* 381 F.3d at 242); *Iwanejko v. Cohen & Grigsby, P.C.*, 2006 WL 2659109, at *9 (W.D. Pa. Sept. 15, 2006) (quoting *Carswell* and stating, "in the Third Circuit 'qualified immunity is an objective question to be decided by the Court as a matter of law.'"); *Brown v. City of Camden*, 2006 WL 2177320, at *7 (D.N.J. July 27, 2006) (citing *Carswell* and saying "In this Circuit, the Court must make the ultimate determination on the availability of qualified immunity as a matter of law.").

24

There is some irony in this, since *Carswell* relied on *Curley I* and *Sharrar*, correctly citing them as support for the proposition that objective reasonableness is a question of law. But neither *Curley I* nor *Sharrar* stand for the related proposition that the question of objective reasonableness cannot be presented to a jury. Indeed they both teach "that a jury can evaluate objective reasonableness when relevant factual issues are in dispute." *Curley I*, 298 F.3d at 279; *see also Sharrar,* 128 F.3d at 830-31.

Nevertheless, the *Carswell* approach, despite its limitations, *see infra* at section III. C., appears to have taken root and to represent the pattern and practice both in our Circuit and much of the rest of the country. We therefore take the opportunity to reiterate and clarify a central message from that case: whether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury. *Carswell*, 381 F.3d at 242. When a district court submits that question of law to a jury, it commits reversible error.

Question Three on the liability verdict sheet was evidently intended to reach the question of qualified immunity.[12] However, as we discuss further below, the

---

[12]We acknowledge again that our language in *Curley I* left open the possibility of giving that question to the jury. Discussing "the procedure for deciding the immunity question when the existence of disputed issues of fact precludes disposition on summary judgment," 298 F.3d at 278, we stated:

> We addressed the issue in *Sharrar*, in which we observed that the "reasonableness of the officers' beliefs or actions is not a jury question," 128 F.3d at 828, but qualified that observation by later noting that a jury can evaluate objective reasonableness when relevant factual issues are in dispute, *id.* at 830-31. This is not to say, however, that it would be inappropriate for a judge to decide the objective reasonableness issue once all the historical facts are no longer in dispute. A judge may use special jury interrogatories, for instance, to permit the jury to resolve the disputed facts upon which the court can then determine, as a matter of law, the ultimate question of qualified immunity.

*Id.* at 279.  We cannot fault the District Court for following our instructions on remand.  Unlike our dissenting colleague, we do not view *Curley I* as making "clear the respective roles of the judge and jury in cases such as this," post at 18.  To the extent *Curley I* can be read as allowing the District Court to submit the question of qualified immunity to the jury we are hard pressed to say the District Court erred in doing so.  We hope, however, that it will now be clear that the second step in the *Saucier* analysis, i.e., whether an officer made a reasonable mistake about the legal constraints on police action and is entitled to qualified immunity, is a question of law that is exclusively for the court.  When the ultimate question of the objective reasonableness of an officer's behavior involves

question as framed actually pertains to whether there was any constitutional violation at all. Since it properly presented an essentially factual question regarding the constitutional violation, it was not error for the jury to consider it.

C.      The Challenge of Preserving "Totality of Circumstances" Review

As this case demonstrates, trying to separate the ultimate from the underlying questions is no easy matter and can have a disturbing, unintended consequence. It can undermine the basic principle that both the threshold constitutional question and the immunity question are to be decided on the totality of the circumstances.

Fundamental fairness dictates a totality-of-the-circumstances review, since the test for reasonableness "is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). It depends on all of the chaotic details that emerge in real time in real life.[13] Yet the

tightly intertwined issues of fact and law, it may be permissible to utilize a jury in an advisory capacity, *see infra* at sec. III.C., but responsibility for answering that ultimate question remains with the court.

[13] We have here a fundamental parting of the ways with the dissent. While our colleague sees this case as coming down to, to use her analogy, one domino in the sequence of events, post at 12, we feel compelled to recognize that reality is a

27

method that we and many other courts have taken to address the mixed legal and factual questions posed by the *Saucier* test cannot easily, perhaps cannot ever, capture those circumstances in their totality. When one picks and chooses a few questions to pose to a jury to ferret out historical facts, staying away from asking the broader question of what constitutes reasonable behavior under those facts, one cannot help but focus attention on some events to the diminution or exclusion of others. In short, a totality-of-the-circumstances test is replaced by a test focusing on those few circumstances featured in the questions a court is able and willing to articulate.

The District Court clearly saw that problem in this case. As quoted before, the judge observed that the analysis in this case could not properly be shrunk into the few moments immediately before Klem shot Curley, but instead must be decided in light of all the events which had taken place over the course of the entire evening. *Post-trial Opinion*, 2006 WL 414093, at *2. The desire to avoid the kind of difficulty presented here is perhaps what has motivated other courts to sanction the alternative approach of permitting the question of objective reasonableness to go to juries. *See Sloman*, 21 F.3d at 1468 ("[S]ending the factual issues to the jury but reserving to the judge the ultimate 'reasonable officer' determination leads to serious logistical difficulties. Special jury verdicts would unnecessarily

---

good deal more complicated than the simple causality evident in falling dominoes.

28

complicate easy cases, and might be unworkable in complicated ones.").

In spite of the foregoing problem inherent in articulating specific questions to address factual issues, our most current precedent counsels that course.[14]  However, while the judge must make the ultimate determination regarding the objective reasonableness of challenged behavior, that does not mean that the use of an advisory jury is foreclosed.  We need not consider the propriety of such a step under the circumstances presented here, though, because the jury in this case was not acting in an advisory capacity. The Court put to the jury the question of the objective reasonableness of Klem's actions, and the Court upheld the verdict rendered.

---

[14]We note that in the Supreme Court's recent decision in *Scott*, 127 S. Ct. 1769 (2007), the Court stated that, because the case "was decided on summary judgment, there [had] not yet been factual findings by *a judge* or jury ... ."  *Id.* at 1774 (emphasis added).  Without wanting to read too much into that statement, since it may refer to nothing more than a case in which the parties waive any right to a jury, it appears the Court at least contemplated a circumstance where a judge may resolve factual issues.  Certainly the dissent in *Scott* was concerned about judicial fact finding.  *See id.* at 1781 (Stevens, J., dissenting) ("Relying on a *de novo* review of a videotape ..., eight of the jurors on this Court reach a verdict that differs from the views of the judges on both the District Court and the Court of Appeals who are surely more familiar with the hazards of driving on Georgia roads than we are.").

IV.

A.     The Jury Was Not Choosing Between Alternative
       Theories of Liability

       The jury was not facing a choice of alternative liability
theories driven by "outcome-determinative facts," as Curley
would have it.  *See Post-trial Opinion*, 2006 WL 414093, at
*4.  The District Court rightly rejected that view.  We did not,
in *Curley I*, presume to set forth any theories of liablilty, let
alone the strict alternatives Curley characterizes our opinion
as requiring.  We simply identified "disputed issues of
material fact with regard to at least two key events – the
inspection of the suspect's vehicle and the actual
confrontation between Klem and Curley."  298 F.3d at 281.
As Curley sees it, resolution of the factual issues in his favor
was not merely a necessary condition for him to prevail, it
was an entirely sufficient condition.  But that was never so.
Our pointing to "*at least* two key events[,]" *id.* (emphasis
added), accurately implied that there were more facts on the
table than the two areas of dispute we singled out for
discussion.  Consistent with our own cases and with precedent
from the Supreme Court, we could not have directed the
District Court to ignore the totality of the circumstances and
to focus instead on those two areas.

       Even if those specifically identified factual areas were
the only ones to be considered, it is an unwarranted leap to
say that the jury's responses to selected yes-or-no questions
means that only one set of inferences and conclusions can be

30

drawn from those responses.  For example, the jury's answer of "no" to the question of whether "Officer Curley raise[d] his gun to point directly at Trooper Ron Klem several times during 'the confrontation'" might mean that the jury decided that Curley had raised his gun to point at Klem only once or twice, rather than "several times," as the question asks.[15]  One need not draw the inference that Curley demands.  Indeed, we cannot.  Though multiple inferences are possible, we must draw all inferences in Klem's favor, rather than Curley's, since we are reviewing a verdict for Klem.  *See McGreevy v. Stroup*, 413 F.3d 359, 364 (3d. Cir. 2005) (on a motion for judgment as a matter of law under Federal Rule 50(a), evidence must be viewed "in the light most favorable to the nonmoving party").  In short, any ambiguity in the interrogatories and the answers to them must, at this stage, be interpreted against Curley.  The District Court therefore did not err in rejecting Curley's "alternative theories of liability" view of the verdict sheet.

B.      The Focus Should Have Been on the Threshold
        Question

        Where the District Court did go astray was in assuming that a constitutional violation had occurred and then applying its efforts to answering the question of immunity.  The Court's confusion appears to have been the product both of

---

[15]Given that Curley acknowledged pointing the gun in the direction of the Camry and that Klem was standing next to the car, it is not fanciful to believe that the jury could have interpreted the question as described.

31

language in our *Curley I* opinion and of the intertwined questions of objective reasonableness posed by the two prongs of the *Saucier* test when applied to this case.

The panel in *Curley I* addressed the question of whether Klem's conduct violated Curley's constitutional rights in the summary judgment context, and thus "consider[ed] only the facts alleged by Curley, taken in the light most favorable to him." *Curley I*, 298 F.3d at 280. In determining that, under Curley's version of the facts, he had established a violation of his constitutional rights, we said:

> [T]hese facts, *viewed in the light most favorable to Curley*, are sufficient to support the claim that Klem's shooting of Curley constituted an unreasonable seizure, violative of Curley's rights under the Fourth Amendment. ... [W]e find that *under Curley's account of events*, it was unreasonable for Klem to fire at Curley based on his unfounded, mistaken conclusion that Curley was the suspect in question.

*Id.* at 280 (emphasis added). The District Court apparently read our opinion as establishing that Curley's constitutional rights were violated. In its ruling on post-trial motions, the District Court stated that "there was a constitutional violation in that Officer Curley had a right not to be shot by Trooper Klem." 2006 WL 414093, at * 1. That, however, is an oversimplification and a misreading of *Curley I*. Whether Klem committed a constitutional tort turns not on the simple fact that he shot the wrong man. That would end the inquiry

32

before it began.  The question is whether Klem's use of force, even though mistakenly directed, was objectively reasonable in light of the totality of the circumstances.  That question had yet to be answered when *Curley I* was decided, since a trial was required.  There is no substitute for "slosh[ing one's] way through the factbound morass of 'reasonableness.'"  *Scott*, 127 S. Ct. at 1778.

Thus, our earlier opinion was not a decision on whether, under all of the facts and circumstances of the case, Klem's conduct violated Curley's constitutional rights.  The jury was not bound at trial, and the District Court was not bound post-trial, by our earlier statements involving a hypothetical set of facts favoring Curley, since the facts and inferences actually found by the jury were clearly different than those which we were required to posit in *Curley I* when considering the summary judgment order.[16]

---

[16] The procedural posture of *Curley I* provides another key reason why we cannot agree with the dissent.  Our colleague takes as a given that *Curley I* established alternative theories of liability based on a "simple syllogism," post at 13-14, but *Curley I* was in a procedural posture that required every inference to be drawn for Curley.  It thus did not present an opportunity to frame a set of factual questions to constrain the jury's fresh look at the evidence.  The jury was not constrained by the *Curley I* opinion's necessarily biased view of the facts, and the jury was therefore free to consider the entire set of facts facing Klem when determining whether Klem's conduct violated Curley's constitutional rights.

33

Confusion between the threshold constitutional inquiry and the immunity inquiry is also understandable given the difficulty courts have had in elucidating the difference between those two analytical steps.[17]  At the risk of understating the challenges inherent in a qualified immunity analysis, we think the most helpful approach is to consider the constitutional question as being whether the officer made a reasonable mistake of fact, while the qualified immunity question is whether the officer was reasonably mistaken about the state of the law.

With that in mind, we turn to the questions presented to the jury in this case.  The constitutional liability question posed to the jury, Question Two on the verdict sheet, was "Did Trooper Ron Klem act in an objectively reasonable manner in shooting Officer Curley during the confrontation?" Question Three, designed as the immunity question, was posed as, "Was Trooper Ron Klem's mistake in firing his weapon objectively reasonable?"  The difference between those two questions is essentially semantic, the only difference being that Question Three makes explicit what was

---

[17]The *Saucier* opinion itself was generated by the confusion inherent in such conceptually close questions.  *See Saucier*, 533 U.S. at 197 ("The matter we address is whether the requisite analysis to determine qualified immunity is so intertwined with the question whether the officer used excessive force in making the arrest that qualified immunity and constitutional violation issues should be treated as one question, to be decided by the trier of fact.").

34

already obvious and conceded in the case: that the shooting was a mistake.

For practical purposes, then, the analysis of objective reasonableness that the District Court undertook under the rubric of an immunity question actually applies better to the preliminary constitutional question. The immunity step of the *Saucier* test is typically focused on established legal standards and requires a review of relevant case law, a review a jury simply cannot undertake. *See Saucier*, 533 U.S. at 205 ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."). However, the constitutional analysis focuses on the factual circumstances of the incident and asks whether the officer made a reasonable mistake of fact. Question Three did exactly that. It asked not whether Trooper Klem made a mistake of law – wrongly believing that it was legal to shoot the wrong person – but whether it was reasonable for him to make the factual mistake of believing Officer Curley was the armed and dangerous Bailey. Therefore, if the jury properly determined that Klem made an objectively reasonable mistake when he shot Curley, then it found that there was no constitutional violation, and the District Court did not err in entering a verdict in favor of

Trooper Klem.[18]  We turn now to that question of the sufficiency of the evidence.

C.      The Jury's Verdict is Supported by the Evidence

The jury's verdict on the objective reasonableness of Trooper Klem's actions is well supported by the record. There are many facts that the jury was entitled to rely on that were not in dispute, including Bailey's behavior prior to and during the high speed car chase that led to the George Washington Bridge.  Bailey had shot and killed a police officer, had shot at another officer, had stolen a police car, had then carjacked the Camry from a rest stop on the New Jersey Turnpike, had launched a high speed chase on the Turnpike and, during that chase, had fired shots at Klem and other officers, wounding an officer and hitting Klem's windshield.  Furthermore, whether or not Klem knew exactly what had occurred, no one disputes that he came on the scene in the immediate aftermath of Bailey's creating additional havoc by crashing into the Pathfinder.  In short, no one

---

[18]The fact that the District Court relied on Question Three as answering the qualified immunity question and entered a verdict based on Trooper Klem deserving qualified immunity is not reversible error.  Because Trooper Klem was entitled to a verdict in his favor either if there was no constitutional violation or if he was entitled to qualified immunity, the error in the District Court's analysis was harmless. *Hill v. Laisz*, 435 F.3d 404, 411 (3d Cir. 2006) (holding that error is harmless where it is "highly probable" that the error did not affect the outcome of the case).

36

disputes that Bailey was actively evading arrest after committing several severe crimes, that he posed a serious danger to both the police and public, and that Klem could properly approach the scene prepared to use deadly force. In fact, Curley himself did so. He testified that, when he began to approach the Camry, his gun was drawn.

The very real danger that both Curley and Klem perceived at the toll plaza was intensified by the presence of numerous innocent bystanders. Curley's solicitude for the safety of the driver of the Pathfinder is not just commendable; it reflects the well-founded fear that people who got out of their cars were in danger of being shot. Added to all of this is the jury's finding that, when Klem approached the wrecked Camry, he saw a toll booth attendant signaling him to look to the middle of the toll plaza. That is where Curley was standing with a gun in his hands.

In Curley's view, none of those facts is of any moment, since Klem's failure to look into the Camry is dispositive. According to Curley, had Klem looked, he would have seen Bailey's dead body and there would have been no confrontation.[19] However, as we have stated several times,

_____

[19] This, of course, is the dissent's view as well, post at 11-12, and we do not suggest that this is illogical, only that it is not the exclusively logical view. We stated in *Curley I* that Klem knew there was only one suspect and, "had Klem known of Bailey's suicide, it would have been clearly unreasonable for him later to confuse Curley with the suspect." 298 F.3d at 281. Hence, the question of whether

the reasonableness of Klem's conduct must be examined based on the totality of the circumstances, and the inquiry cannot be collapsed into a single instant, particularly not when, at that instant, Klem's vision was being drawn by the toll booth attendant toward Curley, standing in the plaza with a gun.[20]  Thus, when we examine all of the facts and circumstances, the jury's verdict that Klem acted reasonably is supported by the evidence.

---

Klem looked in the Camry is highly relevant.  But it is not outcome determinative.  We did not equate looking in the Camry with knowledge of Bailey's death, since it was conceivable that a factfinder could have decided that an objectively reasonable officer could look in the Camry and still not see Bailey, no matter how obvious the body might have been to others not in that officer's unique position.  It was also conceivable that a factfinder could conclude, as the jury apparently did, that despite Klem's overlooking information that could have enlightened him about the suicide, his actions in totality and under the pressure of the moment were such that his failure to look in the car did not make the shooting objectively unreasonable.

[20]The jury's conclusion that Klem's failure to look into the Camry was unreasonable is not beyond dispute.  Given all else that had occurred and was occurring, it can be argued that looking at the gesticulating toll booth attendant, rather than into the car, may not have been the most reasonable action but was still within the bounds of reason.  However, since we are upholding the verdict on other grounds, we do not address that issue.

The mistake Klem made has undoubtedly been terrible in its long-term consequences for Officer Curley and his family, and we do not for a moment discount the pain, sorrow, expense, and frustration that it has visited on them in their innocence. But a mistake, though it may be terrible in its effects, is not always the equivalent of a constitutional violation. In *Curley I*, we acknowledged "the great pressure and intensity inherent in a police officer's hot pursuit of a suspect known to be armed and highly dangerous ... ." 298 F.3d at 280. That would amount to little more than lip service, were we to reverse the jury's verdict and the District Court's thoughtful decision on the post-trial motions. "[P]olice officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. Those were the circumstances facing both Trooper Klem and Officer Curley at the George Washington Bridge toll plaza. Viewed from that perspective, *Saucier*, 533 U.S. at 205, the seizure effected by the mistaken shooting was not unreasonable under the Fourth Amendment. It therefore was not a constitutional violation.

V.

For the foregoing reasons, we will affirm the judgment of the District Court on the ground that no constitutional violation occurred.

*CURLEY v. KLEM ("Curley II")*

39

**ROTH**, Circuit Judge, dissenting:

The jury's findings make clear that, were it not for Trooper Klem's unreasonable actions, the tragic shooting of Officer Curley would never have occurred.  In the special interrogatories, the jury found that the sole perpetrator was dead and visibly sprawled across the passenger seat of the Camry at the time Klem approached it, and that Klem came within an arm's length of the Camry's passenger side window, yet failed to look into the car to check for the perpetrator's body.  Klem admitted at trial that, had he looked into the Camry and seen the perpetrator lying there, Klem would not have confronted and shot Curley.  Klem would have holstered or lowered his gun, thus breaking the chain reaction of events leading to the shooting, and Curley would have walked away unharmed.  In Question 1 of the liability verdict sheet, the jury had to decide whether Klem's failure to break the chain reaction – by failing to look into the Camry – was an objectively reasonable mistake of fact, in light of the totality of the circumstances.  The jury concluded that it was not.

Based on these facts, I cannot agree with the majority's conclusion that the jury returned a verdict for Klem.  The exact opposite is true.  The jury answered Question 1 in favor of Curley, which established a constitutional violation.  Although the jury answered Question 3 in favor of Klem, this question should never have been posed, as it asked the ultimate question

of qualified immunity and encompassed purely legal issues reserved exclusively for the court. The majority concedes that such a question is outside the province of the jury, and our prior precedents, including our prior decision in this case, have never stated otherwise. Therefore, in order to justify its decision to affirm, the majority takes a revisionist view of history and refashions Question 3 into a factual, rather than legal, question. The majority does so notwithstanding the fact that the language and structure of the verdict sheet and the understanding of the District Court and the parties clearly demonstrate that Question 3 was an improper legal question.

For these reasons and those that follow, I respectfully dissent. Question 3 should be stricken, the judgment for Klem should be vacated, and this case should be remanded in order to permit the District Court, rather than the jury, to resolve the ultimate question of qualified immunity. If the District Court were to conclude that immunity is not warranted under clearly established law, judgment should be entered in favor of Curley and the case should proceed to a damages determination.

## I. __BACKGROUND__

In *Curley v. Klem*, 298 F.3d 271 (3d Cir. 2002) ("*Curley I*"), we reversed the summary judgment for Klem on Curley's excessive force claim because the District Court failed to "recognize the existence of disputed historical facts that are clearly material to the question of objective reasonableness." *Id.* at 281. Specifically, we identified a series of disputed facts relating to "two key events – the inspection of the suspect's vehicle and the actual confrontation between Klem and Curley."

41

*Id.* We discussed each event in detail, under separate topic headings entitled "The Body in the Camry" and "The Confrontation," *id.* at 281-282, and noted their sequential relationship to one another:

> When Klem arrived at the toll plaza, he was unaware that his suspect had just shot and killed himself while sitting inside the stolen Camry. But it is uncontroverted that Klem knew there was only one perpetrator. *Thus, had Klem known of Bailey's suicide, it would have been clearly unreasonable for him later to confuse Curley with the suspect.* Assuming that a reasonable officer in Klem's position would have looked inside the Camry upon arriving at the scene, a key issue becomes whether Klem did, in fact, look inside the Camry's window.

*Id.* at 281 (emphasis added). We noted that, while qualified immunity is supposed to act as immunity from suit, not just liability, "the reality [is] that factual disputes often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right." *Id.* at 278. We noted that "[a] judge may use special jury interrogatories, for instance, to permit the jury to resolve the disputed facts upon which the court can then determine, as a matter of law, the ultimate question of qualified immunity." *Id.* at 279. Our analysis was colored by the Supreme Court's directive, in *Saucier v. Katz*, 533 U.S. 194 (2001), that Fourth Amendment qualified immunity analysis "must be undertaken in light of the *specific context of the case*, not as a broad general proposition." *Id.* at 201 (emphasis added).

In accordance with our directives in *Curley I*, the District Court submitted a series of special interrogatories to the jury at the conclusion of trial. These 10 interrogatories were derived from the material fact disputes we had identified in our decision in *Curley I*. Five interrogatories sought to resolve fact disputes relating to the extent of Klem's inspection of the Camry. All of these interrogatories were answered in favor of Curley in that they tended to demonstrate that Klem had acted unreasonably by failing to look into the Camry, where he would have seen the perpetrator's dead body.[21] The other five interrogatories addressed Klem's subsequent confrontation with Curley –

---

[21] These interrogatories are as follows. Interrogatory 1 asked: "At the time Trooper Klem approached the Camry, was the perpetrator's body on the front seat of the car?" The jury answered: "Yes." Interrogatory 2 asked: "At the time Trooper Klem approached the Camry, was the perpetrator's body on the passenger side floor of the car?" The jury answered: "No." Interrogatory 3 asked: "When Trooper Ron Klem was within about an arm's length from the passenger side window of the Camry, did he look into the window of the Camry to see if the perpetrator was in the car?" The jury answered: "No." Interrogatory 4 asked: "Regardless of where the perpetrator's body was located in the Camry, should it have been visible to someone looking in the passenger side window from where Trooper Klem was positioned?" The jury answered: "Yes." Interrogatory 5 asked: "Did Trooper Ron Klem make an objectively reasonable effort to observe into the Camry to determine if the perpetrator was inside the Camry?" The jury answered: "No."

which, by Klem's own admission, never would have happened had Klem acted reasonably by looking into the Camry. Two of these interrogatories were answered in favor of Curley (in that they tended to demonstrate that Klem confronted Curley in an unreasonable manner),[22] one interrogatory was answered in favor of Klem (in that it tended to demonstrate that Klem had acted reasonably),[23] and two interrogatories were left unanswered due to the jury's failure to reach a unanimous decision on them.[24]

_____

[22] These interrogatories are as follows. Interrogatory 7 asked: "Did Officer Curley raise his gun to point directly at Trooper Ron Klem several times during "the confrontation?" The jury answered: "No." Interrogatory 8 asked: "At the time Officer Curley was shot, was Officer Curley's gun coming up to aim at Trooper Ron Klem?" The jury answered: "No."

[23] This interrogatory, Interrogatory 6, asked: "Was it objectively reasonable for Trooper Ron Klem to believe that toll collector Jenkins signaled to him with an arm motion towards the east side center of the plaza?" The jury answered: "Yes."

[24] These interrogatories are as follows. Interrogatory 9 asked: "Was Officer Curley's uniform visible as a police uniform from the position where Trooper Ron Klem was standing?" Interrogatory 10 asked: "Was it objectively reasonable for Trooper Ron Klem to believe that the individual he observed holding a weapon was wearing civilian clothing?"

The District Court also submitted to the jury a separate "Liability Verdict Sheet" premised on and guided by our discussion in *Curley I*. Although the majority opinion reproduces the four liability questions in full, the majority fails to include the instructions that accompanied these questions. Because these instructions are critical to understanding the meaning of the questions themselves, I set forth the verdict sheet in its entirety, as returned by the jury, below:

## LIABILITY VERDICT SHEET

After you have finished answering the written interrogatories, please proceed to liability, and, if appropriate, damage questions.

1.  **Did Trooper Ron Klem's failure to act in an objectively reasonable manner in observing the Camry prevent him from seeing the perpetrator's body in the Camry?**

    __X__ Yes      _____ No

2.  **Did Trooper Ron Klem act in an objectively reasonable manner in shooting Officer Curley during the confrontation?**

    __X__ Yes      _____ No

    If you answered Yes to Question 1 and/or No to Question 2, proceed to Question 3.

45

If you answered No to Question 1 and also Yes to Question 2, then go no further. Stop deliberating and inform the attendant that you have reached the verdict. If not, proceed to Question 3.

**3. Was Trooper Ron Klem's mistake in firing his weapon objectively reasonable?**

   **X**   **Yes**           **No**

If you answered No to Question 3, then proceed to Question 4.

If you answered Yes to Question 3 then proceed no further. Stop deliberating and inform the attendant that you have reached a verdict.

**4. Did the plaintiff suffer damages that were proximately caused by Trooper Ron Klem's conduct?**

          **Yes**           **No**

If you answered Yes to Question 4 you must proceed to the Damages Verdict Sheet.

If you answered No to Question 4, proceed no further. Stop deliberating and inform the attendant that you have reached a verdict.

There is certainly some ambiguity in the verdict sheet. However, as I will discuss below, I believe it is clear that – in light of the special interrogatories, the verdict sheet instructions, and other record evidence – Questions 1 and 2 represented alternate theories of liability, and Question 3 represented the ultimate qualified immunity question. Although Questions 1 and 2 were more or less in accordance with our directives in *Curley I*, Question 3 was not – and it never should have been included on the verdict sheet.

Upon receiving the jury's answer to Question 3, the District Court promptly entered judgment for Klem on that basis, without any further analysis, in a two-page judgment order. *See* 9/29/05 Order. In its post-trial opinion, the District Court made clear that the issue of qualified immunity was out of its hands and had been delegated to the jury in Question 3: "Question 3 properly asks the jurors to make the finding that is inherent in the remand, and in answering it as they did, unanimously, *this jury decided the issue of qualified immunity in Trooper Klem's favor.*" *Curley v. Klem*, No. 98-5256, 2006 WL 414093, at *5 (D.N.J. Feb. 21, 2006) (emphasis added). By entering judgment for Klem on the basis of Question 3, the District Court disregarded the jury's answers to the special interrogatories, overrode the jury's finding of liability in Question 1, and improperly delegated the ultimate question of qualified immunity to the jury.

## II. <u>DISCUSSION</u>

First, I will explain why Questions 1 and 2 were alternate theories of liability. Second, I will explain why Question 3

47

asked the ultimate question of qualified immunity, and thus should be stricken. Third, I will explain how the District Court should have handled the issue of qualified immunity.

## A. Questions 1 & 2

It is self-evident that Klem shot the wrong man. That mistake alone, however, does not establish a Fourth Amendment violation for unreasonable seizure. Rather, what must be shown is that the facts of the case rendered it objectively unreasonable for Klem to mistake Curley for the fleeing perpetrator and then use deadly force to seize him. As we noted in *Curley I*, there are at least two ways in which the jury could have found the mistaken identification and corresponding shooting to be objectively unreasonable. First, the jury could have concluded that Klem acted unreasonably by failing to check the Camry for the perpetrator's body, which directly led to the mistaken identification and shooting. Indeed, we explicitly stated in *Curley I* that, "had Klem known of Bailey's suicide, it would have been clearly unreasonable for him later to confuse Curley with the suspect." 298 F.3d at 281. Second, even if Klem had acted reasonably in failing to check the Camry, the jury could still find that Klem acted unreasonably in mistaking Curley for the perpetrator during the subsequent confrontation depending on the circumstances of that event. *Id.* at 282.

Although these two theories were not the only potential avenues for liability, they were the focus of our opinion in *Curley I* and influenced the District Court's decision to place Questions 1 and 2 on the verdict sheet as alternative theories of liability. The trial record reflects that the parties and the District

48

Court understood and intended Questions 1 and 2 to be alternate liability questions. This understanding was in line with the verdict sheet instructions directing the jury to proceed to Question 3 "[i]f you answered Yes to Question 1 and/*or* No to Question 2" (emphasis added). The fact that an answer for Curley on *either* Question 1 or 2 warranted consideration of Question 3 suggests that Questions 1 and 2 were in fact alternate and independent liability questions. They had to be, because an answer for Curley on either question took the jury to the same place. Questions 1 and 2 operated independently and a finding for Curley on either one was sufficient to establish a constitutional violation.

Klem argues that Question 1 was actually a special interrogatory, as opposed to an independent liability question. This argument makes little sense in light of the fact that all other special interrogatories were placed on a separate sheet entitled "Special Interrogatories" and Question 1 appeared on the "Liability Verdict Sheet." Klem also argues that the District Court would have included instructions to skip Question 2 upon a finding in favor of Curley on Question 1 if those two questions were actually alternate and independent theories of liability. This argument seems plausible at first blush, but Curley rightly points out that it was sensible for the District Court to instruct the jury to answer both questions, despite being independent of one another, in case this Court were to invalidate one of the two theories of liability on appellate review – a reasonable concern given the complexity and history of this case. Finally, Klem argues that our comment in *Curley I* that "a key issue" – as opposed to *the* key issue – was "whether Klem did, in fact, look inside the Camry's window," *id.* at 281, shows that it is

49

impossible for Question 1 to be outcome-determinative.  This argument falls short because it fails to appreciate the fact that identifying *a* proximate cause of an injury can be outcome-

determinative even if it is not the *only* proximate cause of that injury.

With regard to this last argument, the majority adopts a somewhat similar view by arguing that one event – the unreasonable failure to inspect the Camry – cannot alone support liability because the totality of the circumstances must be considered.  I do not dispute that the totality of the circumstances must be considered and I fully agree that "[a]ll of the events leading up to the pursuit of the suspect are relevant." *Carswell v. Borough of Homestead,* 381 F.3d 235, 243 (3d Cir. 1999) (citing *Abraham v. Raso*, 183 F.3d 279, 292 (3d Cir. 1999)).  Indeed, the jury was instructed to consider the totality of the circumstances,[25] and did so in answering Question 1. Application of the totality of the circumstances standard, however, does not make it impossible for one particular circumstance to be outcome-determinative, as it was here, because it is entirely possible that some circumstances are more important that others.  *See Abraham*, 183 F.3d at 292 (disagreeing with the proposition that "all preceding events are equally important" in a similar Fourth Amendment case).  We highlighted this fact in *Curley I* when we explained that Klem's

---

[25]  In its charge to the jury, the District Court stated that "[a]ll of the events leading up to the pursuit of the suspect are relevant," apparently quoting *Carswell* verbatim.  App. at T1166.

unreasonable failure to look into the Camry would be important enough to render his misidentification and shooting of Curley immediately thereafter unreasonable; in other words, the first unreasonable act would necessarily carryover and render the second act unreasonable as well. *See Curley I*, 298 F.3d at 281.

This is so because the high-speed chase was composed of a sequence of events forming a chain reaction, like a row of falling dominoes. One event caused the next event which caused the next. Had Klem looked into the Camry for the sole perpetrator – which is what the jury concluded an objectively reasonable police officer would have done in light of the circumstances[26] – a key domino would have been removed and the chase would have come to an end. Indeed, Klem admitted at trial that, had he seen the perpetrator in the Camry, he never would have shot Curley. App. at T1016. Klem's admission negates any suggestion that, even if he knew of the perpetrator's death, Curley's subsequent approach with a gun might have

---

[26] In *Curley I*, we "[a]ssum[ed] that a reasonable officer in Klem's position would have looked inside the Camry upon arriving at the scene." 298 F.3d at 281. Our assumption was borne out by the jury's findings in Interrogatory 5 and Question 1. In Interrogatory 5, the jury was asked, "Did Trooper Ron Klem make an objectively reasonable effort to observe into the Camry to determine if the perpetrator was inside the Camry?," and answered, "No." In Question 1, the jury was asked, "Did Trooper Ron Klem's failure to act in an objectively reasonable manner in observing the Camry prevent him from seeing the perpetrator's body in the Camry?," and answered, "Yes."

51

nevertheless presented a new danger that would have warranted the use of deadly force.

The District Court correctly instructed the jury: "The question is whether, in the circumstances here, a reasonable officer would not have made the mistake that Trooper Klem made." App. at T1166-67. By concluding, in Question 1, that a reasonable officer would have looked in the Camry – where, according to the jury's findings in the special interrogatories, Bailey was lying in plain view – the jury answered the dispositive question of liability in favor of Curley. For Klem's shooting of Curley to have been reasonable, Klem's misidentification of Curley must have been reasonable as well. The jury concluded that Klem's misidentification was not reasonable. Therefore, the shooting could not have been reasonable.[27] It is this simple syllogism, premised upon the law

---

[27] This is so notwithstanding the jury's answer to Question 2, which, as discussed above, was answered in case this Court were to invalidate Question 1. The shooting during the confrontation was unreasonable by necessity – due to the sequential nature of the events – once the jury concluded that it was unreasonable for Klem not to look into the car. The unreasonableness of Klem's failure to look into the Camry carried over and rendered Klem's misidentification during the confrontation unreasonable as well. This "carry over" effect can be understood with a hypothetical. If, during a high-speed car chase, an officer unreasonably turned off his police radio and therefore did not hear that the perpetrator being pursued had been stopped, by necessity it would be unreasonable if the officer then rammed an innocent driver,

52

of the case as set forth in *Curley I*, *see In re City of Phila. Litig.*, 158 F.3d 711, 722 (3d Cir. 1998) (applying law of the case doctrine in a similar Fourth Amendment case), that the majority fails to appreciate.

For these reasons, I would conclude that, by answering Question 1 in favor of Curley, the jury found that Klem had committed a constitutional violation. In this case, proof of an unreasonable action that directly causes a later action that might otherwise be reasonable but nevertheless should not have occurred should be enough to prove a violation.[28] Having concluded that the jury found a constitutional violation, I

wrongly identified as the feeling perpetrator, after the unreasonable action of turning off the radio – an unreasonable action directly responsible for the misidentification and ramming of the innocent driver. Similarly, Klem's misidentification of Curley is unreasonable due to the unreasonable action that directly preceded it – the failure to look into the Camry – which directly caused the misidentification and shooting to occur.

[28] This is not to say that in all circumstances one unreasonable action that occurs within a series of reasonable actions necessarily establishes a violation. For example, if the hypothetical officer discussed above, *supra* note 7, turned his radio back on before any relevant information was transmitted, the officer's misidentification later would not necessarily constitute a violation simply because of the officer's earlier unreasonable action of turning off his radio.

53

consider whether we should permit that finding to be negated by Question 3.

## B. **Question 3**

As I noted above, there is no dispute that Klem shot the wrong man. Therefore, Questions 1 and 2 did not ask whether Klem had made a mistake, since that was conceded; rather, they asked whether Klem's mistake was an objectively reasonable one, for Fourth Amendment purposes, in light of the factual circumstances at hand. That is, Questions 1 and 2 resolved step one of the *Saucier* test concerning whether a constitutional violation had occurred.

Since the jurors found a constitutional violation by answering "Yes" to Question 1, they next considered Question 3, which asked, "Was Trooper Ron Klem's mistake in firing his weapon objectively reasonable?" The majority acknowledges that "Question Three on the liability verdict sheet was evidently intended to reach the question of qualified immunity," i.e., *Saucier* step two, but nevertheless concludes that Question 3 "actually pertains to whether there was any constitutional violation at all." Maj. Slip Op. at 27. The majority's conclusion is unfounded because, as discussed above, the language and the structure of the verdict sheet make clear that Questions 1 and 2 already asked whether a constitutional violation had occurred. Under the majority's reading, Question 3 is essentially redundant. I believe the more logical reading is that Question 3 sought to resolve *Saucier* step two, i.e., the objective reasonableness of a mistake of law, whereas Questions 1 and 2

54

resolved *Saucier* step one, i.e., the objective reasonableness of a mistake of fact.[29]

As alluded to by the majority, my conclusion is in line with the understanding of the parties and the District Court. In its post-trial opinion, the District Court made clear that Question 3 asked the ultimate question of qualified immunity. The District Court stated that "the litigants agreed to submit the ultimate question of qualified immunity to the jury,"[30] despite

---

[29] That said, there is certainly some ambiguity in the verdict sheet, in large part because "objective reasonableness" is the standard by which a mistake of fact (or any decision based on real or perceived facts) and a mistake of law (or any decision based on a correct or incorrect understanding of the law) must be judged in the context of a Fourth Amendment case such as this one. *See* Maj. Slip Op. at 17-18 (noting that, in a Fourth Amendment case, *Saucier* steps one and two require an objective analysis of what is reasonable under the facts and the law, respectively). Courts create confusion by talking about "objective reasonableness" in the Fourth Amendment context without specific reference to either *Saucier* step one or two.

[30] It should be noted, however, that Curley never agreed to submit the qualified immunity question to the jury. The record clearly reflects that Curley objected to the inclusion of Question 3 on the verdict sheet prior to its submission to the jury. Curley correctly noted that Question 3 asked about a purely "legal matter" that "should not be a jury question." App. at T1062.

the fact that "there is Third Circuit law on the books that indicates the trial judge, and not the jury, decides qualified immunity." *Curley*, 2006 WL 414093, at \*1. Therefore, "the jury would decide the issue of qualified immunity," *id.* at \*4, "and in answering [Question 3] as they did, unanimously, this jury decided the issue of qualified immunity in Trooper Klem's favor," *id.* at \*5. By interpreting Question 3 to apply to *Saucier* step one, rather than step two, the majority is rewriting history.

Having concluded that Question 3 did, in fact, ask the ultimate question of qualified immunity, I consider whether it was permissible for the District Court to submit that question to the jury. I have no trouble concluding that it was not. Although the objective reasonableness of a mistake of *fact* is a question that the jury may answer, the jury may never consider the objective reasonableness of a mistake of *law*.[31] *See Carswell*, 381 F.3d at 242 ("The court must make the ultimate determination on the availability of qualified immunity as a matter of law.") (citing *Curley I*, 298 F.3d at 279 and *Sharrar v. Felsing*, 128 F.3d 810, 828 (3d Cir. 1997)). The majority agrees: "whether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury." Maj. Slip Op. at 25. This was the law at the time of trial, and this is the

---

[31] In this case, the mistake of fact was for Klem to think that Curley was the fleeing perpetrator. The mistake of law, if there was one, would have been for Klem to think that the Fourth Amendment jurisprudence of the Supreme Court and this Court permitted the use of deadly force in this situation, when it did not.

56

law today. Although the jury may "determine[] disputed historical facts material to the qualified immunity question," *Carswell*, 381 F.3d at 242, under no circumstances may the court delegate the ultimate question of qualified immunity to the jury, *id.*, as was done in this case. Rather, the court should have decided – based on the facts of the case, as clarified by the special interrogatories – whether immunity was warranted under the Fourth Amendment jurisprudence of the Supreme Court and this Court.

The majority suggests that our decision in *Curley I* left open the possibility of giving the ultimate question of qualified immunity to the jury. The majority points out that we stated in that case "that a jury can evaluate objective reasonableness when relevant factual issues are in dispute." Maj. Slip Op. at 25 (quoting *Curley I*, 298 F.3d at 279). I disagree with the majority's interpretation of *Curley I*. To the extent we were permitting juries to consider the question of "objective reasonableness," we were referring to the objective reasonableness of one's view of the facts (i.e., *Saucier* step one, which asks whether a violation occurred), as opposed to the objective reasonableness of one's view of the law (i.e., *Saucier* step two, which asks whether a right was clearly established under the case law). *See supra* note 9. Indeed, we made clear the respective roles of the judge and jury in cases such as this one: "A jury must resolve these [fact] issues before a court can determine whether it would have been clear to a reasonable officer that Klem's conduct was unlawful." *Curley I*, 298 F.3d at 283.

The majority also suggests that our decisions in *Sharrar* and *Karnes v. Skrutski*, 62 F.3d 485 (3d Cir. 1995), both Fourth Amendment cases, demonstrate that "[w]e had previously permitted the jury to answer the key immunity question of whether the challenged behavior of a government official was objectively reasonable." Maj. Slip Op. at 22. Although *Sharrar* and *Karnes* are not controlling in light of our subsequent cases, such as *Carswell* and *Curley I*, it is important to note that the majority's suggestion concerning our supposedly "evolv[ing]" precedents, Maj. Slip Op. at 22, is not accurate and is the result of a misreading of *Sharrar* and *Karnes* that resembles the majority's misreading of *Curley I*. In each instance, the majority improperly assumes that a jury empowered to address the objective reasonableness of one's view of the facts may also address the objective reasonableness of one's view of the law. That is not the case and never has been. We have never said that the qualified immunity question concerning the objective reasonableness of an officer's view of the law may be submitted to the jury. "Objective reasonableness" can be a jury issue to the extent it applies to the question of whether, as a factual matter, a violation was committed. However, "objective reasonableness" is most definitely not a jury issue to the extent it applies to the question of whether, as a legal matter, a right was clearly established. Whether a right was clearly established is the "key immunity question"; we have never permitted a jury to answer that question. Indeed, we never would have said so because determining whether a right is clearly established – which requires a review of the applicable case law – is clearly outside the expertise of the jury. There is simply nothing in *Sharrar* or *Karnes* that permits submission of the ultimate

58

question of qualified immunity, i.e., *Saucier* step two, to the jury.[32]

---

[32] For example, in *Sharrar*, we held "that in deciding whether defendant officers are entitled to qualified immunity it is not only the evidence of 'clearly established law' that is for the court but also whether the actions of the officers were objectively reasonable.  Only if the historical facts material to *the latter issue* are in dispute . . . will there be an issue for the jury."  128 F.3d at 828 (emphasis added).  Therefore, we made clear that consideration of *Saucier* step two is exclusively reserved for the court.  (Consequently, I believe the majority misstates the law by saying that, "in a line of cases beginning with *Doe v. Groody*, we began highlighting that 'qualified immunity is an objective question to be decided by the court as a matter of law.'"  Maj. Slip Op. at 23 (citation omitted).  This basic proposition cited by the majority was well-established before *Doe*; it was previously set forth in *Bartholomew v. Pennsylvania*, 221 F.3d 425, 428 (3d Cir. 2000), where we actually cited *Sharrar*, 128 F.3d at 828 for support.)  We went on to find no reversible error where the jury decided the objective reasonableness of what was essentially a mistake of fact, i.e., one officer's mistaken belief that an accompanying officer had obtained a warrant.  *Id.* at 830-31.  In *Karnes*, we made the unremarkable statement that, "[w]hile the qualified immunity defense is frequently determined by courts as a matter of law, a jury should decide disputed factual issues relevant to that determination."  62 F.3d at 491.  We stopped short of saying that a jury may answer the ultimate question of qualified immunity, and we remanded for jury resolution of disputed

59

As previously noted, *supra* note 9, any ambiguity in our precedents exists because "objective reasonableness" is the standard by which mistake of facts *and* mistakes of law are to be judged in the context of the Fourth Amendment's prohibition of unreasonable searches and seizures. Courts, including this one, create confusion by talking about "objective reasonableness" in the Fourth Amendment context without specific reference to either *Saucier* step one or two. The use of the term "objective reasonableness" without reference to factual or legal reasonableness is what has made this area of the law so confusing and it is why our precedents appear at times to say contradictory things with regard to the respective roles of judge and jury in determining objective reasonableness.

I will try to clarify matters. If there are no disputed material facts, the court must determine the objective reasonableness of a mistake of fact (here, whether it was objectively reasonable for Klem to mistake Curley for the perpetrator). However, if there are triable issues of material fact, the jury must determine the objective reasonableness of that mistake of fact. With regard to the objective reasonableness of a mistake of law (here, whether it was objectively reasonable for Klem to believe that the law permitted him to use of deadly force against Curley in the situation at hand), the court should *always* determine this issue, because doing so requires a review of case law, which is not a task appropriate for the jury. (Of course, this second *Saucier* step need not be reached if it is established that no constitutional violation occurred. At that

issues of credibility related to qualified immunity, but not qualified immunity itself. *Id.* at 499.

60

point, there is no violation, so there is no need for immunity analysis.)  If there are no disputed material facts, the court should make this determination as soon as possible.  However, if factual disputes relevant to this legal analysis do exist, the court will have to postpone making this determination until the jury resolves all the relevant factual disputes, because determining what actually happened is a prerequisite to determining whether the law clearly established that a particular action was permitted or prohibited by the Fourth Amendment under those circumstances. *See Saucier*, 533 U.S. at 202 (noting that step two asks "whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*") (emphasis added).  After the jury resolves these relevant fact disputes, presumably through the use of special interrogatories, *see Curley I*, 298 F.3d at 279 (suggesting this method), the court is then capable of deciding whether or not the law clearly permitted or prohibited the conduct constituting the constitutional violation.

The District Court committed reversible error by submitting the ultimate question of qualified immunity to the jury by way of Question 3.  Having so concluded, I next address what the District Court should have done instead.  In doing so, I address what I believe to be the proper methods for handling qualified immunity where material fact disputes preclude resolution of that issue prior to trial.

### C.  **Proper Methods**

After answering one of the two alternate liability questions in favor of Curley, the jury should have been instructed to proceed to Question 4, concerning proximate causation. The jury would have had to find that Klem's shooting of Curley caused Curley's injuries, since the evidence overwhelmingly reflected that fact and the issue was essentially uncontested. Indeed, at the charging conference, counsel for Klem agreed to place the proximate causation question separately at the bottom of the verdict sheet, rather than alongside each liability question, because causation was "not really a contested issue in this case." App. at T1061-62. Next, the jurors should have been instructed to proceed to the separate damages verdict sheet, where they would have had to decide on dollar amounts that accurately reflected the economic and non-economic losses suffered by Curley as a result of Klem's violation.

After receiving the jury's verdict for Curley, the District Court should have considered whether qualified immunity, *Saucier* step two, nevertheless prevented judgment from being entered against Klem. That would have been appropriate if the Fourth Amendment jurisprudence of the Supreme Court and this Court did not clearly establish that Klem's conduct, in the circumstances at hand, was unlawful. In other words, if Klem's conduct could have been the result of an objectively reasonable but mistaken view of law, he should have been entitled to qualified immunity.

In making the ultimate qualified immunity determination for a Fourth Amendment case such as this one, the District Court should have reviewed the answers to the special

62

interrogatories in order to determine what actually happened. Then the District Court should have applied these findings to its survey of the relevant case law in order to determine if it was clearly established that a police officer was permitted to use deadly force in circumstances similar to the instant case. Post-trial briefing likely would have been helpful to the District Court in this regard. If the District Court had concluded that Klem was entitled to qualified immunity, judgment should have been entered for Klem, notwithstanding the jury's verdict. If the District Court had made the opposite conclusion, judgment should have been entered for Curley. Either way, the District Court should have issued a written opinion explaining its reasoning with regard to qualified immunity.

## III. **CONCLUSION**

In my view, the District Court improperly delegated the ultimate question of qualified immunity to the jury. I would vacate the judgment for Klem and remand the case so that the District Court can decide the question of qualified immunity in the first place.[33]

---

[33] However, I would not remand to a different judge, as Curley requests, because there is little evidence, if any, of judicial bias. Curley attempts to show bias by pointing to several unremarkable rulings and remarks made by Judge Hayden during the official proceedings of this case. This Court has said, however, that such official judicial activity is almost never sufficient to warrant recusal under 28 U.S.C. § 455. *See United States v. Bertoli*, 40 F.3d 1384, 1412 (3d Cir. 1994) (citing *Liteky v. United States*, 510 U.S. 540, 554

The District Court considered post-trial motions regarding various issues, including potential inconsistencies in the verdict, and in doing so conducted some analysis of the special interrogatory answers. However, the District Court has not considered qualified immunity anew based on the jury's answers to the special interrogatories and the relevant case law, which is what I believe the law in the Circuit requires. If the District Court were to conclude that Klem was not entitled to qualified immunity, a trial would have to be held on the damages issue, which never reached the jury. If, on the other hand, the court were to conclude that Klem was entitled to qualified immunity, then the court would have to set aside the liability verdict as it had before.[34]

---

(1994)). In addition, a new trial in not required, as Curley requests, for purported racial discrimination during juror selection. The District Court correctly concluded that Curley failed to make out a prima facie showing of racial discrimination during voir dire under *Batson v. Kentucky*, 476 U.S. 79, 96 (1986) and *United States v. Milan*, 304 F.3d 273, 281 (3d Cir. 2002). In any case, Klem's race-neutral explanation for striking the juror at issue was adequate.

[34] Although this Court might be able to conduct the immunity analysis for the first time on appeal based on a review of the law in light of the jury's special interrogatory answers, the District Court is in a better position to do so. For example, the District Court, having sat through the trial and being very familiar with the facts, is in a better position to determine the meaning of answers to some of the more ambiguous special interrogatory questions (such as

64

Although the outcome reached by the majority brings closure to nine years of litigation in this difficult case, I do not believe that this outcome is the correct one. In my view, the majority's decision is not faithful to its own opinion, *Curley I*, or our other precedents, and thus should be modified as I have proposed.

---

Interrogatory 7, *see supra* note 2), and to consider how they apply to the *Saucier* step two analysis. That said, it would be surprising if the District Court were to grant qualified immunity in this situation given Klem's admission in his appellate brief that the issue in this case "is not whether there was a misunderstanding of the law." Klem Br. at 25; *see also* Klem Br. at 2 ("This case, involving a 'friendly fire' shooting as a result of mistaken identity, is one of the class of Fourth Amendment and qualified immunity cases where the *decisive issue* is whether a police officer has made a reasonable *mistake of fact* in carrying out his duties.") (emphasis added).